IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| Eolas Technologies Incorporated, | § | |
| | § | |
| Plaintiff, | § | Civil Action No. 6:09-cv-446 |
| | § | |
| | § | |
| vs. | § | |
| | § | |
| Adobe Systems Inc., Amazon.com, Inc., | § | JURY TRIAL |
| Apple Inc., Blockbuster Inc., CDW Corp., | § | |
| Citigroup Inc., eBay Inc., Frito-Lay, Inc., | § | |
| The Go Daddy Group, Inc., Google Inc., | § | |
| J.C. Penney Company, Inc., JPMorgan | § | |
| Chase & Co., New Frontier Media, Inc., | § | |
| Office Depot, Inc., Perot Systems Corp., | § | |
| Playboy Enterprises International, Inc., | § | |
| Rent-A-Center, Inc., Staples, Inc., Sun | § | |
| Microsystems Inc., Texas Instruments | § | |
| Inc., Yahoo! Inc., and YouTube, LLC | § | |
| | § | |
| Defendants. | § | |

OPENING CLAIM CONSTRUCTION BRIEF
OF PLAINTIFF EOLAS TECHNOLOGIES INC.

# TABLE OF CONTENTS

I.     INTRODUCTION ...........................................................................................................1

II.    BACKGROUND:  PRIOR LITIGATION AND REEXAMINATION ACTIVITY ..........2

III.   PRINCIPLES OF CLAIM CONSTRUCTION ....................................................................3

IV.    LEVEL OF ORDINARY SKILL IN THE ART ................................................................3

V.     OVERVIEW OF THE TECHNOLOGY ...........................................................................4

       A.    The Internet In 1994...........................................................................................4

       B.    The Invention .....................................................................................................5

       C.    The Patents-In-Suit ............................................................................................6

VI.    ARGUMENT:  THE COURT SHOULD ADOPT EOLAS' PROPOSED CLAIM
       CONSTRUCTIONS .........................................................................................................8

       A.    "Executable Application" ...................................................................................8

       B.    "Automatically Invoking The Executable Application"........................................9

       C.    "Text Format" ...................................................................................................13

       D.    "Embed Text Format/Embed Text Format Specifies The Location" ...................14

       E.    "Embed Text Format, Located At/Corresponding To A First Location" .............18

       F.    "Identifying An Embed Text Format" .................................................................19

       G.    "Object" ............................................................................................................21

       H.    "Hypermedia Document".....................................................................................22

       I.    "Distributed Application" ...................................................................................24

       J.    "Client Workstation/Network Server".................................................................25

       K.    No Claim Elements Are Governed By § 112, ¶ 6................................................26

VII.   CONCLUSION...............................................................................................................28

# **TABLE OF AUTHORITIES**

**Page(s)**

CASES

*Affymetrix Inc. v. Hyseq, Inc.*,
  132 F. Supp. 2d 1212 (N.D. Cal. 2001) ..................................................................27

*Alexsam, Inc. v. Humana, Inc.*,
  No. 2:07-CV-288-TJW, 2009 U.S. Dist. LEXIS 77553 (E.D. Tex. Aug. 28, 2009) ...........9, 22

*Aloft Media, LLC v. Adobe Sys.*,
  570 F. Supp. 2d 887 (E.D. Tex. 2008) ..................................................................27

*Am. Med. Sys., Inc. v. Biolitec, Inc.*,
  618 F.3d 1354 (Fed. Cir. 2010) ..........................................................12, 15, 17, 19

*Beneficial Innovations, Inc. v. Blockdot, Inc.*,
  No. 2:07-CV-263-TJW-CE, 2010 U.S. Dist. LEXIS 35784 (E.D. Tex. Apr. 12, 2010) .........27

*Biax Corp. v. Sun Microsystems, Inc.*,
  No. 2:06-CV-364-CE, 2008 U.S. Dist. LEXIS 55101 (E.D. Tex. July 18, 2008) ...............9, 22

*Conoco, Inc. v. Energy & Envtl. Int'l, L.C.*,
  460 F.3d 1349 (Fed. Cir. 2006) ..........................................................................26

*Daiichi Sankyo Co. v. Apotex, Inc.*,
  501 F.3d 1254 (Fed. Cir. 2007) .................................................................3, 6, 7, 8

*Edwards Lifesciences LLC v. Cook, Inc.*,
  582 F.3d 1322 (Fed. Cir. 2009) ..............................................................21, 23, 25

*Eolas Techs., Inc. v. Microsoft Corp.*,
  399 F.3d 1325 (Fed. Cir. 2005) .................................................................2, 5, 8

*Eolas Techs., Inc. v. Microsoft Corp.*,
  No. 99-CV-626, 2000 U.S. Dist. LEXIS 18886 (N.D. Ill. Dec. 29, 2000) .......................27, 28

*Eolas Techs., Inc. v. Microsoft Corp.*,
  No. 99-CV-626, 2004 U.S. Dist. LEXIS 522 (N.D. Ill. Jan. 14, 2004) ....................................2

*EON Corp. IP Holdings, LLC v. Sensus USA Inc.*,
  No. 6:09-CV-116-JDL, 2010 U.S. Dist. LEXIS 83442 (E.D. Tex. Aug. 11, 2010) ........ passim

*Finjan, Inc. v. Secure Computing Corp.*,
  No. 2009-1576, 2010 U.S. App. LEXIS 23216 (Fed. Cir. Nov. 4, 2010) ...................... passim

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
  358 F.3d 898 (Fed. Cir. 2004).......................................................................... passim

*Lighting World, Inc. v. Birchwood Lighting, Inc.*,
382 F.3d 1354 (Fed. Cir. 2004)..................................................................26, 27, 28

*Mirror Worlds, LLC v. Apple, Inc.*,
No. 6:08-CV-88-LED, 2010 U.S. Dist. LEXIS 82070 (E.D. Tex. Aug. 11, 2010) ......... passim

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*,
521 F.3d 1351 (Fed. Cir. 2008)..................................................................10

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005)................................................................. passim

*Pioneer Corp. v. Samsung SDI Co.*,
No. 2:07-CV-170-DF, 2008 U.S. Dist. LEXIS 92937 (E.D. Tex. Mar. 10, 2008).............9, 22

*Salazar v. Procter & Gamble Co.*,
414 F.3d 1342 (Fed. Cir. 2005)................................................................9, 22

*Versata Software, Inc. v. Sun Microsystems, Inc.*,
No. 2:06-CV-358-TJW, 2008 U.S. Dist. LEXIS 63645 (E.D. Tex. Aug. 19, 2008)..............27

*WI-Lan Inc. v. Acer, Inc.*,
No. 2:07-CV-474-TJW, 2010 U.S. Dist. LEXIS 99263 (E.D. Tex. Sept. 20, 2010)....... passim

STATUTES

35 U.S.C. § 112, ¶ 6.......................................................................26, 27, 28

## TABLE OF EXHIBITS

Ex. A          U.S. Patent No. 5,838,906

Ex. B          U.S. Patent No. 5,838,906 Reexamination Certificate Issued June 6, 2002

Ex. C          U.S. Patent No. 5,838,906 Reexamination Certificate Issued Feb. 3, 2009

Ex. D          U.S. Patent No. 7,599,985

Ex. E          Comparison Chart of the Parties' Proposed Constructions for the Disputed
               Claim Terms

Ex. F          Microsoft Press Computer Dictionary (1991)

Ex. G          W3C Member List (June 2, 2003)

Ex. H          W3C Member List (December 5, 2003)

Ex. I          Adobe's Request for Director-Ordered Reexamination of U.S. Patent No.
               5,838,906 (October 15, 2003)

Ex. J          Macromedia, Microsoft, and AOL's Request for Director-Ordered
               Reexamination of U.S. Patent No. 5,838,906 (October 14, 2003)

Ex. K          W3C's Request for Director-Ordered Reexamination of U.S. Patent No.
               5,838,906 (October 28, 2003)

Ex. L          W3C's HTML Patent Advisory Group (PAG) Public Home Page

Ex. M          Microsoft's Request for Ex Parte Reexamination of U.S. Patent No.
               5,838,906 (December 22, 2005)

Ex. N          Excerpt from File History for United States Patent No. 5,838,906 —
               Publication Request for Michael Doyle's January 27, 1994 Presentation at
               "Medicine Meets Virtual Reality II" Conference

Ex. O          Google Corporate Information (google.com/corporate/milestones.html)

Ex. P          eBay Investor Information (investor.ebay.com)

Ex. Q          Go Daddy Homepage (godaddy.com)

Ex. R          Amazon.com   Investor   Relations   FAQ   (phx.corporate-
               ir.net/phoenix.zhtml?c=97664&p=irol-faq#6986)

Ex. S          "About YouTube"  (youtube.com/t/about_youtube)

Ex. T    Yahoo! Company Overview
       (yhoo.client.shareholder.com/press/overview.cfm)

Ex. U    Excerpt from File History for Reexamination of United States Patent No.
       5,838,906 — Declaration of Edward W. Felten (May 7, 2004)

Ex. V    Excerpt from File History for Reexamination of United States Patent No.
       5,838,906 — Declaration of Michael D. Doyle (May 6, 2004) with
       attached excerpt from "Dr. Dobb's Journal"

Ex. W    Excerpt from File History for United States Patent No. 5,838,906 —
       Invention Disclosure Submitted to University of California, San Francisco
       (April 8, 1994)

Ex. X    Excerpt from File History for United States Patent No. 5,838,906 — Co-
       inventor David Martin's Lab Notebook

Ex. Y    Excerpt from File History for United States Patent No. 5,838,906 —
       Abstract Submitted to "Medicine Meets Virtual Reality II" Conference
       (December 13, 1993)

## I.      INTRODUCTION

Pursuant to P.R. 4-5(a), Eolas Technologies Inc. ("Eolas") respectfully submits this opening brief on the proper construction of disputed claim terms of U.S. Patent Nos. 5,838,906 ("the '906 patent") and 7,599,985 ("the '985 patent").  The '985 patent is a recently-issued continuation of an application, now abandoned, which was in turn a continuation of the '906 patent.  Aside from a few minor wording changes, the two patents share the same specification.

Defendants propose some seventeen terms from these two patents-in-suit for construction by the Court,[1] which Eolas has grouped for the purposes this brief into ten categories, addressed below in Sections IV.A-J.  Of these many terms, one has been construed in a previous litigation, and that construction was affirmed on appeal.  Defendants nevertheless propose a new and different construction for this term, importing limitations not present in the construction affirmed by the Federal Circuit.  Numerous other terms disputed by Defendants involve common and familiar language for which a separate construction would only add confusion and provide no help to the jury.  For example, Defendants provide misleading and limitation-laden constructions for easily understood words such as "automatically," "identifying," and "located at a first location."  In addition, many of Defendants' proposed constructions for these and other terms are precluded by the doctrine of claim differentiation.  With respect to at least four disputed terms, for example, Defendants improperly propose that a "parsing" limitation added to create a dependent claim should be read into a term found in an independent claim.  Most of the remaining terms placed at issue by Defendants are actually defined in the specification.  And notwithstanding the clear rule that such definitions should govern claim construction in these circumstances, Defendants again propose misleading and limitation-laden constructions at odds with the specification's broad definitions for these terms.

---

[1] The parties' Joint Claim Construction and Prehearing Statement lists twenty-two claims for construction by the Court, but Defendants have since agreed to drop their dispute with respect to five of those terms, including "parse," "file," "type information," "computer readable program product," and "computer readable media."  *See* Dkt. No. 479 at 4-7.

In short, while Eolas properly proposes ordinary-language or plain-meaning constructions for the terms at issue, Defendants repeatedly and improperly propose constructions that either ignore or directly conflict with Federal Circuit precedent.

## II.    BACKGROUND:  PRIOR LITIGATION AND REEXAMINATION ACTIVITY

As noted, this is not the first litigation involving the technology at issue.  In 1999, Eolas sued Microsoft in the Northern District of Illinois for infringement of the '906 patent.  At the trial of that case in 2003, a jury found the patent infringed and not invalid, and awarded Eolas damages of $520 million.  *Eolas Techs., Inc. v. Microsoft Corp.*, 399 F.3d 1325, 1332 (Fed. Cir. 2005).  In early 2004, the district court entered judgment against Microsoft reflecting the jury's verdict.  *Eolas Techs., Inc. v. Microsoft Corp.*, No. 99-CV-626, 2004 U.S. Dist. LEXIS 522 (N.D. Ill. Jan. 14, 2004).  On appeal in 2005, the Federal Circuit—in an opinion authored by Judge Rader—affirmed the finding of infringement, upheld the $520 million verdict, and (of particular significance here) affirmed the district court's construction of the claim term "executable application."  *Eolas*, 399 F.3d at 1336.  The Federal Circuit nevertheless remanded the case for consideration of certain evidence related to the so-called "Viola" reference that had been excluded in the jury trial.  *Id.*

Prior to the date on which the limited retrial was set to begin, however, the Patent Office completed a Director-ordered reexamination of the '906 patent on the "Viola" reference and other alleged prior art.  This reexamination had been urged by Microsoft and some of the Defendants in this case, including Adobe, Apple, and Oracle.[2]  On June 6, 2006, the PTO issued the reexamination certificate for the '906 patent, expressly confirming the validity of its claims in light of the "Viola" and other references.  Ex. B.  Faced with this confirmation of the patent,

---

[2] Adobe, Apple, and Oracle, among others, were all members of the so-called "World Wide Web Consortium" or "W3C" standards-setting body at this time.  Ex. G; Ex. H.  Adobe and the entire W3C joined Microsoft in sending letters to the Patent Office requesting a Director-ordered reexamination of the '906 patent.  Ex. I; Ex. J; Ex. K.  It is also worth noting that at least Adobe and Oracle, again, among others, participated in the W3C's anti-Eolas "HTML Patent Advisory Group" at this time.  Ex. L.

and the PTO's explicit rejection of the art on which it was relying, Microsoft settled the litigation with Eolas in 2007.[3]

## III.   PRINCIPLES OF CLAIM CONSTRUCTION

Eolas proposes constructions for the disputed terms of the '906 and '985 patents in accordance with long-established principles of claim construction:  giving a claim term the full breadth of its ordinary meaning that one of skill in the art, at the time of the invention and in light of the patent's specification and prosecution history, would have given it, except in those circumstances in which the intrinsic record provides a definition for the term.  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1316-17 (Fed. Cir. 2005).  Because the Court is familiar with this law, Eolas will discuss specific claim construction principles only where they are applicable to the terms in dispute.

## IV.   LEVEL OF ORDINARY SKILL IN THE ART

Claims are to be construed from the viewpoint of a person of ordinary skill in the art at the time of the invention.  *Id.* at 1313.  The level of ordinary skill is a function of many factors, including:  "(1) the educational level of the inventor; (2) type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology; and (6) educational level of active workers in the field." *Daiichi Sankyo Co. v. Apotex, Inc.*, 501 F.3d 1254, 1256 (Fed. Cir. 2007) (citation omitted). Considering all of those factors in the context of the technology of the '906 and '985 patents, one of ordinary skill in the art in the 1994 time frame would have had a Bachelor of Science degree, or its equivalent, in computer science.

---

[3] In December 2005, while the Director-ordered reexamination was still pending, Microsoft also filed a second reexamination of the '906 patent.  Ex. M.  This reexamination concluded on February 3, 2009—again reaffirming the validity of the '906 patent.  Ex. C.  The "Viola" reference has thus been twice considered by the PTO, and twice rejected, in reexaminations of the '906 patent.  Significantly, the examiner likewise made no objections based on the "Viola" reference during the prosecution of the '985 patent.

## V.     OVERVIEW OF THE TECHNOLOGY

### A.     The Internet In 1994

The patents-in-suit disclose inventions making possible interactivity on the Internet.  To understand the significance of these inventions, it is helpful to take a step back and remember what the Internet looked like when the '906 patent was filed in 1994.  The Internet was in its infancy then—there was no Netscape Navigator; no Microsoft Internet Explorer.  It was a place of static text, blue-underlined hyperlinks, and the occasional static image.  This reality is nicely captured in the following screenshot of Microsoft's first 1994-era website:



Microsoft's first website (c. April 1994).[4]

And while Microsoft had only recently launched its earliest website around the time of the inventions at issue, several Defendants in this case—including Amazon, eBay, Go Daddy,

---

[4] Source:  http://www.microsoft.com/misc/features/features_flshbk.htm#hp1 ("A Brief History of Microsoft on the Web").  Microsoft's website is relevant because, then as now, Microsoft was and is one of the largest companies in this space.  Screenshots from the early websites of defendants in this case including Amazon, Apple, Google, and Yahoo can be found at http://www.telegraph.co.uk/technology/6125914/How-20-popular-websites-looked-when-they-launched.html ("How 20 Popular Websites Looked When They Launched").

Google, and Yahoo! (some of the largest Internet companies in the world today)—had not yet been founded.[5]

### B.    The Invention

Against this backdrop of a World Wide Web populated with sites consisting of static text and images with blue-underlined links, Dr. Michael Doyle and his co-inventors had an idea that would change the Internet forever.  Their idea:  to embed interactive content directly into the previously-static web pages.

By education, Dr. Doyle is a biologist.  His co-inventors, David Martin and Cheong Ang, are computer scientists.   In early 1993, Michael Doyle and his co-inventors were at the University of California working on the "Visible Embryo Project," which involved a database containing images and videos of cross-sectioned embryos.   Dr. Doyle and his co-inventors thought it would be good if they could share their research, including these images and videos, with other medical researchers around the world, using the Internet.  The inventors set to work straight away.  Because neither Netscape Navigator nor Microsoft Internet Explorer existed at this time, they obtained the source code for one of the earliest web browsers, called "Mosaic," and spent several months modifying the code to allow for the embedding of interactive content in a web page—in this case, the videos of cross-sectioned embryos.  Dr. Doyle and his co-inventors documented the conception of their invention in their lab notebooks at least as early as September 1993, and again in papers they published later in the fall of 1993. *See* Exs. V-Y.

On January 27, 1994, Dr. Doyle presented an embodiment of the inventions in the patents-in-suit to an audience of scientists at the "Medicine Meets Virtual Reality II" medical conference.[6]  Ex. N; Ex. Y.  This 1994 presentation was videotaped, and the following images are screenshots from that videotape showing the inventions of the patents-in-suit in operation:

---

[5]  YouTube was founded in 2005; Google in 1998; Go Daddy in 1997; eBay in 1995; and Amazon and Yahoo! in 1994.  Exs. O-T.

[6]  In the prior case with Microsoft, the district court found conception and reduction to practice "no later than January 27, 1994"—the date Dr. Doyle presented his invention at this conference. *Eolas*, 399 F.3d at 1329.  While actual conception clearly took place months earlier, the court

 



**Top-view cross-section of head in embedded browser widow, with control pane.**   **Front-view of head in embedded browser window, with control pane.**

In the first screenshot, a top-view cross-section is shown in an embedded interactive browser window. In the second screenshot, the image within the embedded interactive browser window has been rotated by the user to show a front-view and the cross-sectioning has been removed. These images show the utilization of embedded interactive content in a web browser as of January 27, 1994—months before Microsoft launched its first static webpage, and years before many of the Internet-based Defendants in this case launched their first sites. In short, the inventions disclosed in the patents-in-suit made possible today's highly interactive Internet.

### C.    The Patents-In-Suit

Consistent with the preceding discussion, one of the stated goals of the patents-in-suit was to disclose "a system that allows the accessing, display and manipulation of large amounts of data, especially image data [*e.g.* a video or a 3D image], over the Internet . . . ." '906 patent at 6:21-25.[7] The inventions enable the user, inter alia, "to rotate, scale and otherwise reposition the viewpoint with respect to these images without exiting the hypermedia browser software." *Id.* at

---

had no need to determine the precise date in the prior case because the January 27, 1994 presentation allowed Eolas to swear behind all of the prior art upon which Microsoft was relying.

[7] As mentioned previously, the '906 and '985 patents largely share the same specification. Accordingly, unless otherwise stated, all citations are to the '906 patent's specification.

7:12-15.  The patents provide examples of this related to the inventors' work on the Visible Embryo Project.  For instance, Figure 9 shows the accessing, display, and manipulation of image data in the form of an "interactive visualization of a 7-week old 3D embryo dataset":



**Figure 9 from the '906 patent showing "a screen display generated in accordance with the present invention."**

As the patent explains, this Figure provides "a display of the invention showing an interactive application object (in this case a three dimensional image object) in a window within a browser window."  '906 patent at 16:8-11.

At a high level, the claimed inventions involve three primary components relevant for claim construction purposes.  First, there is the "browser application."  The browser is responsible for parsing the text formats in a hypermedia document, detecting links to embedded interactive data objects in the webpage, invoking an executable application used to display and manipulate the embedded data objects, and showing the resulting display to the user.  *Id.* at 9:15-45.  Second, there is the "executable application."  This is responsible for "execut[ing] instructions to perform processing," where an example of such processing "is multidimensional image visualization."  *Id.* at 9:40-58.  Finally, there is the "object," which is what the user interacts with and manipulates.  As the patent explains, "[o]bjects may be text, images, sound

files, video data, documents or other types of information that is presentable to a user of a computer system." *Id*. at 2:14-16.

## VI.     ARGUMENT:  THE COURT SHOULD ADOPT EOLAS' PROPOSED CLAIM CONSTRUCTIONS

### A.     "Executable Application"

| Claim Term(s) | Eolas' Proposal | Defendants' Proposal |
|---|---|---|
| executable application | any computer program code, that is not the operating system or a utility, that is launched to enable an end-user to directly interact with data | a compiled native binary program, designed to help users perform certain tasks, that remains discrete and separate from the browser application, and is not the operating system, a utility, or a library |
| This claim term is present in every claim of the patents-in-suit.[8] | | |

As noted above, the term "executable application" was construed in Eolas' prior litigation with Microsoft to mean "any computer program code, that is not the operating system or a utility, that is launched to enable an end-user to directly interact with data." *Eolas Techs.,* 399 F.3d at 1336. The Federal Circuit affirmed this construction on appeal, holding that "the district court correctly gleaned the proper definition of the term from the intrinsic evidence including the patent claims and prosecution history."[9] *Id.* Eolas' proposal tracks the construction affirmed by the Federal Circuit, and should be adopted for that reason. *See id.* at 1336, 1338.

Defendants' proposal, on the other hand, improperly imports narrowing limitations constraining the term to be, inter alia, "a compiled native binary program." This language is found nowhere in the patents' claims or specification; Defendants appear to draw it from a

---

[8] To the extent a term is present in an independent claim, it is necessarily present in all claims depending from that claim as well. The patents-in-suit collectively have fifteen independent claims:  the '906 patent has six (claims 1, 4, 5, 6, 9, and 10), and the '985 patent has nine (claims 1, 16, 20, 24, 28, 32, 36, 40, and 44).

[9] While the Federal Circuit's decision in *Eolas* was issued a few months prior to the en banc decision in *Phillips*, the emphasis on the supporting intrinsic evidence for the construction of "executable application" confirms that the decision in *Eolas* is entirely consistent with the holding in *Phillips*. *See Eolas Techs.*, 399 F.3d at 1336, 1338; *Phillips*, 415 F.3d at 1315-17.

statement made by the examiner in the "Notice of Intent to Issue Ex Parte Reexamination Certificate" ("NIRC") for the '906 patent.  Dkt. No. 479-2 at B69-72.  That statement was neither made nor ratified by the applicants, however, and the law holds that such unilateral statements of a patent examiner place no constraints on claim scope.  *See Salazar v. Procter & Gamble Co.,* 414 F.3d 1342, 1347 (Fed. Cir. 2005); *Alexsam, Inc. v. Humana, Inc*., No. 2:07-CV-288-TJW, 2009 U.S. Dist. LEXIS 77553, at *22-23 (E.D. Tex. Aug. 28, 2009); *Biax Corp. v. Sun Microsystems, Inc.*, No. 2:06-CV-364-CE, 2008 U.S. Dist. LEXIS 55101, at *22 (E.D. Tex. July 18, 2008); *Pioneer Corp. v. Samsung SDI Co.*, No. 2:07-CV-170-DF, 2008 U.S. Dist. LEXIS 92937, at *13 (E.D. Tex. Mar. 10, 2008).

"Executable application" should therefore be construed to mean "any computer program code, that is not the operating system or a utility, that is launched to enable an end-user to directly interact with data."

### B.      "Automatically Invoking The Executable Application"

| Claim Term(s) | Eolas' Proposal | Defendants' Proposal |
|---|---|---|
| automatically [invoking / invoke] [the / said] executable application | No further construction of this term is needed. In the alternative, to the extent a construction is deemed necessary, this term should be construed to mean: automatically calling or activating the executable application[10] | in response to the browser parsing an embed text format, the executable application is launched to permit a user to interact with the object immediately, without any intervening activation of the object by the user |
| executable application is automatically invoked by the browser | No further construction of this term is needed. In the alternative, to the extent a construction is deemed necessary, this term should be construed to mean: executable application is automatically called or activated by the browser | |
| These claim terms are collectively present in every claim of the patents-in-suit. | | |

The law is clear that claim construction "is not an obligatory exercise in redundancy," and that district courts "are not (and should not be) required to construe every limitation present

---

[10]  Underlining in the proposed construction indicates that the underlined word has been separately construed or separately proposed for construction.

in a patent's asserted claims."  *WI-Lan Inc. v. Acer, Inc.*, No. 2:07-CV-474-TJW, 2010 U.S. Dist. LEXIS 99263, at *76-77 (E.D. Tex. Sept. 20, 2010); *see also O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008).  In particular, when the "claim language is clear to a lay jury who will understand the term," this Court may properly resolve the parties' dispute simply by rejecting the unnecessary and unhelpful construction proposed by Defendants and holding that the term will have its plain and ordinary meaning.  *See Mirror Worlds, LLC v. Apple, Inc.,* No. 6:08-CV-88-LED, 2010 U.S. Dist. LEXIS 82070, at *20 (E.D. Tex. Aug. 11, 2010); *see also EON Corp. IP Holdings, LLC v. Sensus USA Inc*., No. 6:09-CV-116-JDL, 2010 U.S. Dist. LEXIS 83442, at *71-72 (E.D. Tex. Aug. 11, 2010) ("The Court also finds the terms do not require construction because their meanings are clear in the context of the claims and will be readily understandable to the jury."); *Finjan, Inc. v. Secure Computing Corp.*, No. 2009-1576, 2010 U.S. App. LEXIS 23216, at *20-21 (Fed. Cir. Nov. 4, 2010) ("Unlike *O2 Micro*, where the court failed to resolve the parties' quarrel, [here] the district court rejected Defendants' construction.").

That is just what the Court should do with respect to this term.  Once the included term "executable application" is properly construed, as discussed above, the additional "automatically invoke[d]/invoking" language in this term needs no further construction.  As in *Mirror Worlds* and *EON*, this language is "clear in the context of the claims and will be readily understandable to the jury."  *See EON*, 2010 U.S. Dist. LEXIS 83442, at *71-72; *Mirror Worlds*, 2010 U.S. Dist. LEXIS 82070, at *20.  This conclusion is reinforced by the observation that this "automatically invoke" language appears only in the claims of the patents-in-suit, and thus was given no special meaning either in the specification or in the prosecution history of either patent.

Nevertheless, if the Court believes that this term requires additional construction, it should adopt Eolas' proposal as "automatically calling or activating the executable application."  This proposal comports with the ordinary and customary usage of the language at issue.  In particular, the term "invoke," as used with respect to the invocation of software, would be understood by one of ordinary skill in the art to mean "calling or activating" an application,

where such "calling or activating" could include "launching" an application.  *See* Ex. F, MICROSOFT PRESS COMPUTER DICTIONARY at 196 (1991).[11]  The term to be construed would therefore be understood by one of ordinary skill in the art to mean "automatically calling or activating the executable application."  *See Phillips*, 415 F.3d at 1314-15.

Defendants' proposal, on the other hand, suffers from numerous critical flaws, at least three of which each call for an explicit rejection from this Court.  *See WI-Lan*, 2010 U.S. Dist. LEXIS 99263, at *76-77; *Finjan*, 2010 U.S. App. LEXIS 23216, at *20-21.

*First*, the "browser parsing" language in Defendants' proposal constitutes a limitation that has nothing to do with the ordinary meaning of "automatically invoke."  This is confirmed by the claims containing the "automatically invoke" term themselves, some of which also contain additional "parsing" language, and others of which do not.  *Compare* '906 patent claim 1 *with* '985 patent claims 1, 5, 6; *see also Phillips*, 415 F.3d at 1314 ("the claims themselves provide substantial guidance as to the meaning of particular claim terms").  Claims 1, 5, and 6 of the '985 patent are particularly instructive, for while independent claim 1 contains the "automatically invoking" limitation at issue, dependent claim 5 adds a "parsing" limitation not present in claim 1, and dependent claim 6 adds a further limitation that the "parsing is by a parser in the browser."  *See* '985 patent claims 1, 5, 6.  The doctrine of claim differentiation thus confirms that that the term "automatically invoking" does not include, in itself, any "browser parsing" limitation.  *See Phillips*, 415 F.3d at 1315; *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004).  This observation alone provides sufficient reason to reject Defendants' proposal.  *See Phillips*, 415 F.3d at 1315.

---

[11] Because the intrinsic record does not define the phrase at issue, this is a situation where reference to a technical dictionary may be proper if the Court finds it necessary.  *See Phillips*, 415 F.3d at 1318 ("Within the class of extrinsic evidence, the court has observed that dictionaries and treatises can be useful in claim construction. . . . Such evidence, we have held, may be considered if the court deems it helpful in determining the true meaning of language used in the patent claims.") (internal quotation omitted).

*Second*, the "immediately" language in Defendants' proposal constitutes another limitation that has nothing to do with the ordinary meaning of "automatically invoke." "Automatically" is a common word, well within the understanding of the jury, that requires no special construction by this Court. *See Mirror Worlds*, 2010 U.S. Dist. LEXIS 82070, at *20; *EON*, 2010 U.S. Dist. LEXIS 83442, at *71-72. One thing "automatically" does *not* mean, however, is "immediately." Indeed, Defendants' own extrinsic evidence demonstrates as much. Dkt. No. 479-2 at B26. This observation also provides sufficient reason, in itself, to reject Defendants' proposal. *See WI-Lan*, 2010 U.S. Dist. LEXIS 99263, at *76-77; *Finjan*, 2010 U.S. App. LEXIS 23216, at *20-21.

*Third*, the "without any intervening activation of the object by the user" language in Defendants' proposal constitutes yet one more limitation that has nothing to do with the ordinary meaning of "automatically invoke." In fact, "intervening activation of the object" is a concept that has nothing at all to do with either the asserted claims or the specification of the patents-in-suit. The claim language is unmistakably directed to the *invocation of the executable application*. Defendants' proposal, however, seems to suggest that an *invocation of the object* is somehow relevant to the patents-in-suit. This proposal could only confuse the jury, and should be rejected for that reason. *See WI-Lan*, 2010 U.S. Dist. LEXIS 99263, at *78. In addition, the suggestion that "automatically invoke" precludes any action by the user is again foreclosed by the doctrine of claim differentiation. Claim 1 of the '985 patent, for example, contains the "automatically invoking" limitation at issue, but claim 11 adds the limitation "where automatically invoking does not require interactive action by the user." *See* '985 patent claims 1, 11. This limitation added to dependent claim 11 once again gives rise to a strong presumption that independent claim 1 is not so limited. *See Phillips*, 415 F.3d at 1315; *Liebel-Flarsheim*, 358 F.3d at 910; *Am. Med. Sys., Inc. v. Biolitec, Inc.*, 618 F.3d 1354, 1360 (Fed. Cir. 2010).

The Court should therefore resolve the parties' dispute as to this term by explicitly rejecting Defendants' improper proposal and holding that the term will have its plain and ordinary meaning. *See WI-Lan*, 2010 U.S. Dist. LEXIS 99263, at *76-77; *Finjan*, 2010 U.S.

App. LEXIS 23216, at *20-21.  In the alternative, the Court should construe this term to mean "automatically calling or activating the executable application."

C.    "Text Format"

| Claim Term(s) | Eolas' Proposal | Defendants' Proposal |
|---|---|---|
| text format | text that initiates processing | a predefined set of tags or symbols that specify the formatting of a document |
| This claim term is present in every claim of the patents-in-suit. | | |

The claims at issue provide that the browser application "identif[ies] text formats included in said distributed hypermedia document and for responding to predetermined text formats *to initiate processing specified by said text formats*."  '906 Patent, claim 1 (emphasis added).  The claimed "text formats" are thus best understood in the context of the patents-in-suit as "text that initiates processing."  *See Phillips*, 415 F.3d at 1316 ("A fundamental rule of claim construction is that terms in a patent document are construed with the meaning with which they are presented in the patent document.").  Nothing in the intrinsic record of the patents-in-suit, on the other hand, requires that "text formats" be "predefined," nor that they must necessarily "specify the formatting of a document," as Defendants propose.

While the specification does not define "text format," it does explain that HTML tags are "an example" of a text format that may be "used by the present invention to embed a link to an application program with a hypermedia document."  '906 patent at 12:54-65.  In describing an embodiment of the '906 patent, with reference to the "modifications" the applicants made to the Mosaic browser, the specification explains that the "HTMLparse.c" file works by "pars[ing] or scan[ning] for HTML tags or other symbols."  *Id*. at 14:10-23.  The file continues "scanning" to "obtain the next item (*e.g.* word, tag or symbol) from the document."  *Id*. at 14:24-29.  Examples of "text formats" thus include "words, tags or symbols"—but there is no requirement that these be "predefined," nor that they necessarily "specify the formatting of a document."  Because Eolas' proposal most naturally aligns with the use of the "text format" term in both the specification and the claims themselves, it should be adopted.  *See Phillips*, 415 F.3d at 1316.

13

"Text format" should therefore be construed to mean "text that initiates processing."

**D.     "Embed Text Format/Embed Text Format Specifies The Location"**

| Claim Term(s) | Eolas' Proposal | Defendants' Proposal |
|---|---|---|
| embed text format | No further construction of this term is needed. In the alternative, to the extent a construction is deemed necessary, this term should be construed to mean:<br><br>text format for embedding an object | a tag that specifies the object to be embedded at the location of the tag |
| embed text format specifies the location of at least a portion of [an / said] object | No further construction of this term is needed. In the alternative, to the extent a construction is deemed necessary, this term should be construed to mean:<br><br>embed text format that specifies the location of at least part of an object | To name or state explicitly or in detail the location of at least a portion of [an / said] object. |
| These claim terms are collectively present in every claim of the patents-in-suit. | | |

Once the included term "text format" is properly construed, as discussed above, the terms "embed text format" and "embed text format specifies the location" should require no further construction. As in the *Mirror Worlds* and *EON* cases referenced above, this additional language is "clear in the context of the claims and will be readily understandable to the jury." *See EON*, 2010 U.S. Dist. LEXIS 83442, at *71-72; *Mirror Worlds*, 2010 U.S. Dist. LEXIS 82070, at *20. The Court should thus once again resolve the parties' dispute as to these terms by explicitly rejecting Defendants' improper proposals and holding that the terms will have their plain and ordinary meaning. *See WI-Lan*, 2010 U.S. Dist. LEXIS 99263, at *76-77; *Finjan*, 2010 U.S. App. LEXIS 23216, at *20-21.

In the alternative, if the Court believes that these terms require additional construction, it should construe them to mean "text format for embedding an object," and "embed text format that specifies the location of at least part of an object." *See Phillips*, 415 F.3d at 1312 ("the words of a claim are generally given their ordinary and customary meaning") (citation omitted).

Defendants' proposals reflect a similar fundamental understanding of the meaning of these terms, but their proposals for both terms improperly add unnecessary language and

14

limitations not found in the claims.  *See id.* at 1323 (noting that terms should not be construed so as to import limitations into the claims).

With respect to "embed text format specifies the location," Defendants' proposal replaces the easily understood "specifies" with the more complicated "to name or state explicitly or in detail."  This only adds confusion, and would not be helpful for the jury—which would be distracted by an unnecessary and misleading analysis of whether, *e.g.*, the location was specified "in detail."  *See WI-Lan*, 2010 U.S. Dist. LEXIS 99263, at *78.  The word "specifies" will be "readily understandable to the jury," and should not be replaced with Defendants' more complicated phrase, which has no connection to the specification.  *See EON*, 2010 U.S. Dist. LEXIS 83442, at *71-72.  Indeed, Defendants themselves appear to recognize as much when they propose a construction for the term "embed text format" that includes the word "specifies."

And with respect to "embed text format," Defendants' proposal again suffers from at least three critical flaws, each of which calls for an explicit rejection from this Court.  *See WI-Lan*, 2010 U.S. Dist. LEXIS 99263, at *76-77; *Finjan*, 2010 U.S. App. LEXIS 23216, at *20-21.

*First*, Defendants' proposal improperly narrows the term by providing that it must be "a tag."  As noted above, the specification makes clear that, at the very least, a text format can be a "word, tag or symbol."  '906 patent at 14:24-29.  Indeed, Defendants' own proposal for "text format" (though otherwise improper, as explained above) describes that term as a "set of tags or symbols."  This is reinforced by the doctrine of claim differentiation.  For while independent claim 1 of the '985 patent contains the term at issue, dependent claim 3 adds the limitation "where the text formats are HTML tags."  '985 patent claims 1, 3.  The fact that a dependent claim adds the "tag" limitation gives rise to a strong presumption that the independent claim is not so limited.  *See Phillips*, 415 F.3d at 1315; *Liebel-Flarsheim*, 358 F.3d at 910; *Biolitec*, 618 F.3d at 1360.  There is therefore no reason for the Court to find that an "embed text format" must be limited to "a tag."  This observation alone provides sufficient reason to reject Defendants' proposal.  *See Finjan*, 2010 U.S. App. LEXIS 23216, at *20-21.

*Second*, Defendants' proposal improperly narrows the term by providing that it "specifies the object."  In fact the claim language itself makes clear that, when the embed text format specifies something, that something is "the location of at least a portion of an object."  *See* '985 patent claim 1.  The claims themselves thus confirm that the "embed text format" need not—as Defendants propose—"specif[y] the object."  *See Phillips*, 415 F.3d at 1314 ("the claims themselves provide substantial guidance as to the meaning of particular claim terms").  This observation again provides sufficient reason to reject Defendants' proposal.  *See Finjan*, 2010 U.S. App. LEXIS 23216, at *20-21.

*Third*, Defendants' proposal improperly narrows the term by providing that the "object" is "embedded at the location of the tag."  Defendants' litigation-inspired position is, in effect, that the "object" must be found in the same location as the "embed text format."  Or, in other words, that there must be a literal and direct, location-to-location correspondence between the embed text format and the object.  But the claims themselves again demonstrate that this is not the case.  Independent claim 1 of the '985 patent, for example, claims "an embed text format which *corresponds to a first location* in the document, where the embed text format *specifies the location* of at least a portion of an object . . . ."  *See* '985 patent, claim 1 (emphasis added).  Nothing inherent in the claimed "corresponds to" or "specifies" requires that the object be embedded at the same location as the embed text format, or that the correspondence between the embed text format and the object be literal and direct.  *See Phillips*, 415 F.3d at 1314.

This is confirmed by dependent claims 8 and 9 of the '985 patent.  Claim 8 adds the limitation "where the correspondence is implied by the order of the text format in a set of all of the text formats."  *Id.* at claim 8.  This additional limitation would make no sense if the claimed "corresponds to" necessarily required a literal and direct, location-to-location correspondence.  Indeed, claim 8 demonstrates that there is no such requirement.  *See id.*  And claim 9 adds the limitation "where the embed text format specifies the location of at least a portion of an object *directly*."  *Id.* at claim 9 (emphasis added).  This additional limitation further demonstrates that *direct* correspondence is not inherent in the term at issue; that, to the contrary, the embed text

16

format may specify the location of at least a portion of an object *indirectly*.[12]  *See id.*  These dependent claims thus confirm—again, by the doctrine of claim differentiation—that the "embed text format" term found in the independent claim does not require that the "object" is "embedded at the location of the tag."  *See Phillips*, 415 F.3d at 1315; *Liebel-Flarsheim*, 358 F.3d at 910; *Biolitec*, 618 F.3d at 1360.

Defendants may argue that something in the prosecution history of the patents-in-suit suggests that the "object" must "be embedded at the location of the tag."  But the allegedly supporting evidence they cite shows no such thing.  *See* Dkt. 479-2 at B140-58.  And in fact the prosecution history affirmatively demonstrates that Defendants are wrong on this point.  For example, in the first reexamination of the '906 patent, Eolas' expert Dr. Edward Felten explained that objects are embedded in web pages "by including in the web page's HTML text an embed text format, that provides information about where to get the object's data."  Ex. U, May 7, 2004 Declaration of Dr. Edward W. Felten (accompanying May 11, 2004 Applicants' Response), at ¶ 18.  This assertion is consistent with and supports Eolas' position:  the embed text format need not be found at the same location as the object; it need only "provide information about where to get the object's data."  The relevant prosecution history thus confirms Eolas' reading of the claims and specification of the patents-in-suit.

This third observation again provides sufficient reason, in itself, to reject Defendants' proposal.  *See Finjan*, 2010 U.S. App. LEXIS 23216, at *20-21; *Phillips*, 415 F.3d at 1315.

The Court should therefore resolve the parties' dispute as to these terms by explicitly rejecting Defendants' improper proposals and holding that the terms will have their plain and ordinary meaning.  *See WI-Lan*, 2010 U.S. Dist. LEXIS 99263, at *76-77; *Finjan*, 2010 U.S. App. LEXIS 23216, at *20-21.  In the alternative, the Court should construe the terms to mean,

---

[12] This makes sense.  For example, one can make a reference which "corresponds to" and "specifies" a person directly (*e.g.*, "John Smith") or one can make a reference which "corresponds to" and "specifies" a person indirectly (*e.g.*, "my first grade teacher").

in accordance with Eolas' ordinary-language proposals, "text format for embedding an object," and "embed text format that specifies the location of at least part of an object."

### E.    "Embed Text Format, Located At/Corresponding To A First Location"

| Claim Term(s) | Eolas' Proposal | Defendants' Proposal |
|---|---|---|
| embed text format, located at a first location in said first distributed hypermedia document | No further construction of this term is needed. In the alternative, to the extent a construction is deemed necessary, this term should be construed to mean:<br><br>embed text format located at a first location in the first distributed hypermedia document | embed text format located at the place in the received document where the embedded object will appear within the displayed document |
| embed text format [which] correspond[s/ing] to [a / said] first location in the document | No further construction of this term is needed. In the alternative, to the extent a construction is deemed necessary, this term should be construed to mean:<br>embed text format which relates to a first location in the document | embed text format located at the place in the received file where the embedded object will appear within the displayed document |
| These claim terms are collectively present in every claim of the patents-in-suit. | | |

The terms "text format" and "embed text format" have been addressed above.  Once the Court has resolved the parties' disputes as to those included terms, these longer terms once again contain no additional language that requires further construction.  The additional language at issue in these terms is "located at a first location" and "corresponding to a first location."  This language is again "clear in the context of the claims and will be readily understandable to the jury."  *See EON*, 2010 U.S. Dist. LEXIS 83442, at *71-72; *Mirror Worlds*, 2010 U.S. Dist. LEXIS 82070, at *20.  The Court should thus once more resolve the parties' dispute as to these terms by explicitly rejecting Defendants' improper proposals and holding that these terms will have their plain and ordinary meaning.  *See WI-Lan*, 2010 U.S. Dist. LEXIS 99263, at *76-77; *Finjan*, 2010 U.S. App. LEXIS 23216, at *20-21.

In the alternative, if the Court believes that these terms require additional construction, it should construe them to mean "embed text format located at a first location in the first

distributed hypermedia document" and "embed text format which relates to a first location in the document," respectively.  *See Phillips*, 415 F.3d at 1312 ("the words of a claim are generally given their ordinary and customary meaning") (citation omitted).

Defendants' proposals, on the other hand, again improperly inject into the claims the limitation that the "object" and the "embed text format" will be found in the same location.  *See Phillips*, 415 F.3d at 1314-15.  But clearly there is nothing in the ordinary meaning of "a first location" that would require that location to be the place "where the embedded object will appear."  And as discussed in connection with the "embed text format" term above, this proposed limitation finds no support in the claims, the specification, or the prosecution history, and it is further affirmatively precluded by the doctrine of claim differentiation.  *See id.*; *Liebel-Flarsheim*, 358 F.3d at 910; *Biolitec*, 618 F.3d at 1360; '985 patent claims 1, 8, 9.

For the reasons discussed above, therefore, the Court should reject Defendants' narrowing proposals and hold that these terms will have their plain and ordinary meaning.  *See WI-Lan*, 2010 U.S. Dist. LEXIS 99263, at *76-77; *Finjan*, 2010 U.S. App. LEXIS 23216, at *20-21.  Or, in the alternative, it should adopt Eolas' ordinary-language proposals for these terms. *See Phillips*, 415 F.3d at 1312, 1314.

### F.      "Identifying An Embed Text Format"

| Claim Term(s) | Eolas' Proposal | Defendants' Proposal |
|---|---|---|
| identify[ing] an embed text format | No further construction of this term is needed. In the alternative, to the extent a construction is deemed necessary, this term should be construed to mean:  detecting an embed text format | detecting an embed text format during parsing of a hypermedia document |
| an embed text format . . . is identified | No further construction of this term is needed. In the alternative, to the extent a construction is deemed necessary, this term should be construed to mean:  an embed text format is detected | |
| These claim terms are collectively present every claim of the '985 patent. | | |

Once again Defendants propose that the Court construe terms that needs no construction. These terms add only "identifying" or "identified" to the already addressed "embed text format." But once the Court has resolved the parties' dispute as to "embed text format," there is no need for further construction of the terms "identifying" or "identified."  This language again is "clear to a lay jury who will understand the term," and therefore the longer phrase "does not require construction."  *See Mirror Worlds,* 2010 U.S. Dist. LEXIS 82070, at *20; *EON*, 2010 U.S. Dist. LEXIS 83442, at *71-72.  The Court should thus again resolve the parties' dispute as to these terms by explicitly rejecting Defendants' improper proposal and holding that the terms will have their plain and ordinary meaning.  *See WI-Lan*, 2010 U.S. Dist. LEXIS 99263, at *76-77; *Finjan*, 2010 U.S. App. LEXIS 23216, at *20-21.

In the alternative, if the Court believes that these terms require additional construction, it should construe them to mean "detecting an embed text format" and "an embed format is detected," respectively.  *See Phillips*, 415 F.3d at 1312 ("the words of a claim are generally given their ordinary and customary meaning") (citation omitted).

Significantly, Defendants' proposals, like the alternative proposals offered by Eolas, recognize that "detecting" is synonymous with "identifying."  But Defendants' proposals also improperly equate "identifying" with "parsing."   And as discussed with respect to the "automatically invoking" term above, the doctrine of claim differentiation precludes that equation.  In particular, while independent claim 1 of the '985 patent contains the "identifying an embed text format" term, dependent claim 5 adds the limitation "where the step of identifying an embed text format comprises:  parsing the received file to identify text formats included in the received file."  '985 patent claims 1, 5.  The language in claim 5 thus confirms that while identification may occur "during parsing," that is not always necessarily the case.  Again, therefore, Defendants' proposals are precluded by the doctrine of claim differentiation.  *See Phillips*, 415 F.3d at 1315.  Further, as the Federal Circuit has explained, "where the limitation that is sought to be 'read into' an independent claim already appears in a dependent claim, the doctrine of claim differentiation is at its strongest."  *Liebel-Flarsheim*, 358 F.3d at 910.

Again, therefore, the Court should reject Defendants' narrowing proposals and hold that these terms will have their plain and ordinary meaning.  *See WI-Lan*, 2010 U.S. Dist. LEXIS 99263, at *76-77; *Finjan*, 2010 U.S. App. LEXIS 23216, at *20-21.  Or, in the alternative, it should adopt Eolas' ordinary-language proposals for these terms.  *See Phillips*, 415 F.3d at 1312.

G.      "Object"

| Claim Term(s) | Eolas' Proposal | Defendants' Proposal |
|---|---|---|
| object | text, images, sound files, video data, documents or other types of information that is presentable to a user of a computer system | information capable of being retrieved and presented to a user of a computer system, which is not a program and which does not include source code or byte code |
| This claim term is present in every claim of the patents-in-suit. | | |

The law recognizes that "a patentee may define his own terms" in the specification, and that in "these situations, the inventor's lexicography governs."  *See Mirror Worlds*, 2010 U.S. Dist. LEXIS 82070, at *8; *Phillips*, 415 F.3d at 1316-17; *Edwards Lifesciences LLC v. Cook, Inc.*, 582 F.3d 1322, 1329 (Fed. Cir. 2009).  Such is the case with the term "object."  The specification of the patents-in-suit makes clear that "[o]bjects may be text, images, sound files, video data, documents or other types of information that is presentable to a user of a computer system."  '906 patent at 2:14-27.  Eolas' proposed construction for the term is taken directly from this broad definition provided by the inventors, and it should be adopted for that reason.  *See Phillips*, 415 F.3d at 1316.

Defendants' proposal, on the other hand, improperly narrows the specification's broad definition of this term by excluding "programs" and anything with "source code or byte code."  But nowhere in the intrinsic record of the patents-in-suit did the inventors so limit the term "object."  To the contrary, they made clear that the term included "other types of information that is presentable to a user of a computer system."  '906 patent at 2:14-27.  The patentees also taught, in the abstract of the invention, that "a user of a browser program [may] execute an embedded *program* object."  *Id.* at Abstract (emphasis added); *see also id.* at 1:61-2:6 (referring to "data objects").  The broad definition of "object" provided in the specification, combined with

21

its references to "program objects" and "data objects," precludes Defendants' unnecessarily narrow construction of the term.  *See Phillips*, 415 F.3d at 1316, 1323.

Defendants may attempt to argue that the applicants disclaimed the specification's broad definition of "object" during prosecution, but that is simply not the case.  Indeed, as with the "executable application" term addressed above, Defendants appear to draw their proposed narrowing language for this term from statements made by the examiner in the NIRC for the first reexamination of the '906 patent.  *See* Dkt. 479-2 at B94-96.  But as noted above, those statements were neither made nor ratified by the applicants, and the law holds that such unilateral statements of a patent examiner do not operate to narrow claim scope.  *See Salazar*, 414 F.3d at 1347; *Alexsam*, 2009 U.S. Dist. LEXIS 77553, at *22-23; *Biax*, 2008 U.S. Dist. LEXIS 55101, at *22; *Pioneer*, 2008 U.S. Dist. LEXIS 92937, at *13.

The term "object" should therefore be construed to mean "text, images, sound files, video data, documents or other types of information that is presentable to a user of a computer system."

### H.   "Hypermedia Document"

| **Claim Term(s)** | **Eolas' Proposal** | **Defendants' Proposal** |
|---|---|---|
| [first] hypermedia document | a document that allows a user to click on images, sound icons, video icons, etc., that link to other objects of various media types, such as additional graphics, sound video, text, or hypermedia or hypertext documents | a document received by the browser that includes links (specified by the hypertext format) to graphics, sound, video or other media |
| [first] distributed hypermedia document | [first] hypermedia document that allows a user to access a remote data object over a network | |
| file containing information to enable a browser application to display [, on] [said/the] [client workstation,] at least [a / said] portion of [a / said] distributed hypermedia document | the file contains information to allow the browser application to display at least part of a distributed hypermedia document | |
| These claim terms are collectively present in every claim of the patents-in-suit. | | |

As with the previous term, the patentees acted as their own lexicographers with respect to "hypermedia document."  As the specification defines it, a "hypermedia document" is "similar to a hypertext document, except that the user is able to click on images, sound icons, video icons, etc., that link to other objects of various media types, such as additional graphics, sound, video, text, or hypermedia or hypertext documents."  '906 patent at 2:14-27.  Again, Eolas' proposed construction for the term is taken directly from this broad definition provided by the inventors, and it should be adopted for that reason.  *See Phillips*, 415 F.3d at 1316; *Edwards Lifesciences*, 582 F.3d at 1329; *Mirror Worlds*, 2010 U.S. Dist. LEXIS 82070, at *8.

Defendants' proposal, on the other hand, again improperly narrows the specification's broad definition of this term by requiring that it be a document "received by the browser" that includes "links (specified by the hypertext format)."  Because nothing in the intrinsic record requires these narrowing limitations, *see* Dkt. No. 479-2 at B114-38, they should be rejected in favor of the specification's explicit definition of the term—which, as the Federal Circuit has held, should govern in these situations.  *See Phillips*, 415 F.3d at 1316.

The term "hypermedia document" should therefore be construed to mean, in accordance with the specification's definition, "a document that allows a user to click on images, sound icons, video icons, etc., that link to other objects of various media types, such as additional graphics, sound video, text, or hypermedia or hypertext documents."  The two related terms grouped with this one above—for which Defendants propose no distinct construction—should also be construed as proposed by Eolas.  Each simply reflects the ordinary-language meaning of the term at issue.  *See Phillips*, 415 F.3d at 1312, 1314.

I.      "Distributed Application"

| Claim Term(s) | Eolas' Proposal | Defendants' Proposal |
|---|---|---|
| distributed application | an application that may be broken up and performed among two or more computers | application external to the browser, where application tasks that could be performed on a single computer are instead broken up and performed at the same time on both the client workstation and one or more computers that are remote to the client workstation |
| This claim term is present in independent claims 36, 40, and 44 of the '985 patent. | | |

Eolas' proposed construction for this term is once again drawn directly from the specification. In describing a further "Application (Distributed)" embodiment of the invention, the specification teaches that, "[i]n th[is] example, tasks such as volume rendering may be broken up and easily performed among two or more computers." '906 patent at 11:18-38. The proposed construction of "distributed application" as "an application that may be broken up and performed among two or more computers" thus "stays true to the claim language and most naturally aligns with the patent's description of the invention." *See Phillips*, 415 F.3d at 1316; *Mirror Worlds*, 2010 U.S. Dist. LEXIS 82070, at \*8. It is thus, "in the end, the correct construction." *Phillips*, 415 F.3d at 1316.

Defendants' proposed construction, on the other hand, improperly imports numerous limitations not inherent in the term, and not required by the intrinsic evidence. *See id.* at 1323. For example, Defendants' proposal adds limitations requiring that the application be "external to the browser"; requiring that it "could be performed on a single computer"; requiring that it be "performed at the same time on both the client workstation and one or more computers"; and requiring that those computers be "remote to the client workstation." None of these many requirements are necessarily inherent in the ordinary meaning of "distributed application"—indeed, Defendants' own extrinsic evidence demonstrates as much. *See* Dkt. No. 479-2 at B200. And some of these requirements are in fact foreclosed by the specification. For example, the specification provides that "[t]hese computers *can* be remote from each other," '906 patent at 11:27 (emphasis added)—thus precluding Defendants' suggestion that they *must* be remote from

24

each other.  In short, the inventors provided a description of a "distributed application," and never disavowed a broader definition of the term.  *See* Dkt. No. 479-2 at B180-96.  Defendants' unjustifiably narrow proposal should thus be rejected, and Eolas' specification-supported proposal adopted.  *Phillips*, 415 F.3d at 1316.

"Distributed application" should therefore be construed to mean "an application that may be broken up and performed among two or more computers."

**J.      "Client Workstation/Network Server"**

| **Claim Term(s)** | **Eolas' Proposal** | **Defendants' Proposal** |
|---|---|---|
| client workstation | a computer system connected to a network that serves the role of an information requester | a desktop or deskside computer with an operating system and hardware designed for technical or scientific applications that provides higher performance than a personal computer |
| network server | a computer system that serves the role of an information provider | a computer running software that is capable of executing applications responsive to requests from a client workstation, and that processes commands from a client workstation to locate and retrieve documents or files from storage |
| These claim terms are collectively present in every claim of the patents-in-suit. | | |

The patentees again acted as their own lexicographers with respect to these terms.  As the patents-in-suit explain, "[f]or purposes of this specification, client and server computers are categorized in terms of their predominant role as either an information requestor or provider.  Clients are generally information requestors, while servers are generally information providers."  '906 patent at 4:55-59.  Eolas' proposals for these "client workstation" and "network server" terms are thus once again drawn directly from the definition provided in the specification, and should be adopted for that reason.  *See Phillips*, 415 F.3d at 1316; *Edwards Lifesciences*, 582 F.3d at 1329; *Mirror Worlds*, 2010 U.S. Dist. LEXIS 82070, at *8.

Defendants' proposals, on the other hand, again improperly import numerous limitations not required by the specification's definition for these terms.  *See Phillips*, 415 F.3d at 1316, 1323.  With respect to "client workstation," for example, nothing in the specification suggests that such a computer must be "designed for technical or scientific applications," nor that it must

"provide[] higher performance than a personal computer."  To the contrary, the specification describes "personal computers" and "workstations" as playing the same role in the inventions of the patents-in-suit.  *See* '906 patent 6:17-19 (noting that "client computer 108 of FIG. 2" represents "small client computers in the form of personal computers or workstations").  Defendants may attempt to argue disavowal based upon a statement in the prosecution history to the effect that "the first computer *could be* much more powerful than the client computer," *see* Dkt. No. 479-2 at B33 (emphasis added), but this is nothing like a "clear and unmistakable disclaimer of claim scope."  *See Conoco, Inc. v. Energy & Envtl. Int'l, L.C.*, 460 F.3d 1349, 1364 (Fed. Cir. 2006).  Similarly, with respect to "network server," nothing in the specification or the prosecution history suggests that such a computer must be limited by the many requirements Defendants' proposal would import into the term.  *See* Dkt. No. 479-2 at B30-35.

"Client workstation" should therefore be construed to mean "a computer system connected to a network that serves the role of an information requester," and "network server" to mean "a computer system that serves the role of an information provider."

### K.        No Claim Elements Are Governed By § 112, ¶ 6.

In an act of conspicuous excess, Defendants also propose some fifty-three claim elements for construction pursuant to the "means-plus-function" provision of 35 U.S.C. § 112, ¶ 6—notwithstanding the fact that not a single one of these claim elements utilizes the word "means." *See* Dkt. No. 479-2 at B223-41.  This fact triggers a presumption that § 112, ¶ 6 does not apply here, and the Federal Circuit has made clear "that the presumption flowing from the absence of the term 'means' is a strong one that is not easily overcome."  *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1358 (Fed. Cir. 2004).  And Defendants in fact will not be able to overcome this strong presumption with respect to any of the elements at issue.

Virtually every one of these elements includes a phrase containing either the words "computer readable program code for . . ." or "software comprising computer executable instructions [to] . . . " followed by a description of the code's (or software's) operation.  *See* Dkt. No. 479-2 at B223-41.  Numerous cases—from both inside and outside of this District, and

including cases from this Court—hold that such code- and software- related terms describe sufficient structure to avoid application of § 112, ¶ 6.  In *Affymetrix Inc. v. Hyseq, Inc.*, 132 F. Supp. 2d 1212 (N.D. Cal. 2001), for example, the court found that "'computer code' is not a generic term, but rather recites structure that is understood by those of skill in the art to be a type of device for accomplishing the stated function."  *Id.* at 1232; *see also id.* at 1232 ("112, ¶ 6 does not apply to the terms recited in the form, 'computer code that [performs x function].'").  Other in-District cases have reached the same conclusion.  *See Beneficial Innovations, Inc. v. Blockdot, Inc.*, No. 2:07-CV-263-TJW-CE, 2010 U.S. Dist. LEXIS 35784, at *44-46 (E.D. Tex. Apr. 12, 2010) (finding that the term "programmatic elements" referred to "part of a central computer system that carries out the instruction sequence," and thus was not subject to § 112, ¶ 6); *Versata Software, Inc. v. Sun Microsystems, Inc.*, No. 2:06-CV-358-TJW, 2008 U.S. Dist. LEXIS 63645, at *36-37 (E.D. Tex. Aug. 19, 2008) (finding that "the phrase 'computer readable program code configured to cause a computer to' followed by a purportedly functional operation" was not subject to § 112, ¶ 6); *Aloft Media, LLC v. Adobe Sys.,* 570 F. Supp. 2d 887, 898 (E.D. Tex. 2008) ("[W]hen the structure-connoting term 'computer code' is coupled with a description of the computer code's operation, as provided by the 'wherein' clauses, sufficient structural meaning is conveyed to persons of ordinary skill in the art.  The Court therefore finds that the 'computer code' elements referenced by the 'wherein' clauses recite sufficiently definite structure to avoid the ambit of § 112, P 6.").

As each of these cases make clear, the code- and software-related elements at issue connote structure, and are not simply "nonce word[s] . . . substitut[ing] for the term 'means for.'" *Lighting World*, 382 F.3d at 1360.  As such, they are not subject to § 112, ¶ 6.  *See id.*; *see also Beneficial Innovations*, 2010 U.S. Dist. LEXIS 35784, at *45.  Two additional observations are worth making on this point.  First, claim 6 of the '906 patent—which includes the "computer readable program code for . . ." language at issue here—was the focus of the claim construction proceedings in Eolas' prior case against Microsoft.  *See Eolas Techs., Inc. v. Microsoft Corp.*, No. 99-CV-626, 2000 U.S. Dist. LEXIS 18886, at *9-11 (N.D. Ill. Dec. 29, 2000).   And

significantly, the court in that case did not construe any element in this claim as a means-plus-function term subject to § 112, ¶ 6. *See id.* at *56. Second, the fact that Defendants were able to propose structure-connoting constructions (prior to dropping them) for the terms "computer readable media" and "computer program product," *see* Dkt. No. 479 at 6, further confirms that these computer-related elements are not simply "nonce word[s]" under the Federal Circuit's opinion in *Lighting World*, 382 F.3d at 1360. Accordingly, § 112, ¶ 6 does not apply to any of the claim elements identified by Defendants.

It should also be noted that, even if § 112, ¶ 6 did apply to some or all of the claim elements identified by Defendants—though it applies to none—Defendants nevertheless have not correctly identified the corresponding structure for these elements. *See* Dkt. No. 479-2 at B223-41. The proper corresponding structure for these elements, identified in the alternative by Eolas, is found in appendix A to the parties' Joint Claim Construction and Prehearing Statement. *See* Dkt. No. 479-1 at 7-16.

## VII.    CONCLUSION

For the foregoing reasons, Eolas respectfully requests that the Court reject each and every of Defendants' improper proposals for the disputed claim terms, and—as appropriate depending on the term at issue—either adopt Eolas' proposed construction or hold that the disputed term will have its plain and ordinary meaning.

Dated: December 23, 2010.

**McKool Smith, P.C.**

/s/  Mike McKool

Mike McKool
Lead Attorney
Texas State Bar No. 13732100
mmckool@mckoolsmith.com
Douglas Cawley
Texas State Bar No. 04035500
dcawley@mckoolsmith.com
**McKool Smith, P.C.**
300 Crescent Court, Suite 1500
Dallas, Texas 75201
Telephone: (214) 978-4000
Telecopier: (214) 978-4044

Kevin L. Burgess
Texas State Bar No. 24006927
kburgess@mckoolsmith.com
John B. Campbell
Texas State Bar No. 24036314
jcampbell@mckoolsmith.com
Josh W. Budwin
Texas State Bar No. 24050347
jbudwin@mckoolsmith.com
Gretchen K. Harting
Texas State Bar No. 24055979
gharting@mckoolsmith.com
Matthew B. Rappaport
Texas State Bar No. 24070472
mrappaport@mckoolsmith.com
**McKool Smith, P.C.**
300 West Sixth Street, Suite 1700
Austin, Texas 78701
Telephone: (512) 692-8700
Telecopier: (512) 692-8744
**ATTORNEYS FOR PLAINTIFF**
**EOLAS TECHNOLOGIES, INC.**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that true and correct copies of the foregoing document were served to all counsel of record via the Court's ECF system.

<u>  /s/ Josh Budwin</u>
Josh Budwin