# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| Eolas Technologies Incorporated and The Regents Of The University Of California | ) ) ) | |
| *Plaintiffs and Counterdefendants,* | ) ) ) | Civil Action No. 6:09-CV-446-LED |
| vs. | ) ) | |
| Adobe Systems Inc.; Amazon.com, Inc.; CDW Corp.; Citigroup Inc.; The Go Daddy Group, Inc.; Google Inc.; J.C. Penney Corporation, Inc.; Staples, Inc.; Yahoo! Inc.; and YouTube, LLC, | ) ) ) ) ) | JURY TRIAL DEMANDED |
| *Defendants and Counterclaimants.* | ) ) ) ) ) ) | |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW UNDER RULE 50(b) THAT THE ASSERTED CLAIMS OF THE PATENTS-IN-SUIT ARE NOT INVALID OR IN THE ALTERNATIVE FOR A NEW TRIAL UNDER RULE 59

i

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

RESPONSE TO PLAINTIFFS' STATEMENT OF ISSUES ...................................... 2

ARGUMENT ............................................................................................................. 2

I.  PLAINTIFFS' RENEWED REQUEST FOR JMOL SHOULD BE DENIED ................. 2

    A.  Plaintiffs' Motion Includes Grounds Not Preserved Under Rule 50(a) ................ 2

    B.  Legal Standard: JMOL Must Be Denied If There Is Sufficient Evidence To Support Any One Theory of Invalidity ............................................................ 3

    C.  There Is Substantial Evidence For A Reasonable Jury To Conclude The Patents Are Obvious Based On MediaView .......................................................... 4

    D.  There Is Substantial Evidence For A Reasonable Jury To Conclude The Patents Are Obvious In Light Of Mosaic and HTML+ ...................................... 10

    E.  Plaintiffs' Secondary Considerations Showing Provides No Basis For JMOL ................................................................................................................ 11

    F.  Plaintiffs' Arguments Regarding Viola Are Incorrect and Irrelevant ................ 13

        1.  There Is Substantial Evidence For A Reasonable Jury To Find The Patents Anticipated By Viola .................................................................. 13

        2.  The Record Supports A Finding That Viola Is A Single Reference ........ 15

        3.  There Is Substantial Evidence For A Reasonable Jury To Find That Viola Discloses The Asserted Claims ..................................................... 17

            a.  "embed text format specifies the location of at least a portion of an object" ................................................................. 17

            b.  "type information to identify and locate" ................................... 17

            c.  "distributed application" ............................................................ 21

            d.  "HTML tags" .............................................................................. 21

        4.  There Is Sufficient Evidence For A Jury To Find That Viola Was Publicly Known And Used Under §§ 102(a), (b), and (g) ...................... 22

        5.  There Is Sufficient Evidence For The Jury To Find The Asserted Claims Obvious In Light Of Viola ........................................................ 25

II.     PLAINTIFFS' RULE 59 REQUEST FOR NEW TRIAL SHOULD BE DENIED........ 26

    A.     There Was No Jury Confusion, Passion, Or Prejudice ........................................ 27

    B.     The Jury's Verdict Is Supported By the Great Weight Of The Evidence............ 30

    C.     The Plaintiffs' Litigation Settlements Were Properly Excluded ......................... 30

CONCLUSION.................................................................................................................... 30

## TABLE OF AUTHORITIES

**Cases**                                                                                    **Pages**

*Agrizap, Inc. v. Woodstream Corp.*
    520 F.3d 1337 (Fed. Cir. 2008)............................................................. 11

*Ameranth, Inc. v. Menusoft Sys. Corp.*
    No. 2:07-CV-271-RSP (E.D. Tex. May 26, 2011) .......................................... 26

*Cordance Corp. v. Amazon.com, Inc.*
    658 F.3d 1330 (Fed. Cir. 2011)........................................................... 3, 27

*Dawson v. Wal-Mart Stores, Inc.*
    978 F.2d 205 (5th Cir. 1992). ............................................................. 26

*Dresser-Rand Co. v. Virtual Automation, Inc.*
    361 F.3d 831 (5th Cir. 2004)) ............................................................. 26

*Dystar Textilfarben GmbH & Co. v. CH Patrick Co.*
    464 F. 3d 1356 (Fed. Cir. 2006)........................................................... 11

*Eolas Techs. Inc. v. Microsoft Corp.*
    399 F. 3d 1325 (Fed. Cir. 2005)................................................. 15, 22, 24

*Flowers v. S. Reg'l Physician Svcs.*
    247 F. 3d 229 (5th Cir. 2001) .............................................................. 2

*Frazier v. Honeywell Int'l, Inc.*
    518 F. Supp. 2d 831 (E.D. Tex. 2007) ...................................................... 4

*Function Media, L.L.C. v. Google, Inc.*
    2011 U.S. Dist. LEXIS 101998, at *9 (E.D. Tex. Sept. 9, 2011) ..................... 14

*Honeywell Int'l, Inc. v. Nikon Corp.*
    2009 U.S. Dist. LEXIS 17115, at *7-8 (D. Del. Mar. 4, 2009) ........................ 12

*i4i Ltd. P'ship v. Microsoft Corp.*
    670 F. Supp. 2d 568 (E.D. Tex. 2009),
    affirmed and modified in part by 589 F.3d 1246 (Fed. Cir. 2009) ....................16

*In re GPAC Inc.*
    57 F.3d 1573 (Fed. Cir. 1995)............................................................. 12

*Iron Grip Barbell Co., Inc. v. USA Sports, Inc.*
    392 F.3d 1317 (Fed. Cir. 2004)........................................................... 12

*Koito Mfg. Co. v. Turn-Key-Tech, LLC*
     381 F.3d 1142 (Fed. Cir. 2004) ...................................................................................... 15

*Krippelz v. Ford Motor Co.*
     2012 U.S. App. LEXIS 1504, at *18-19 (Fed. Cir. Jan. 27, 2012) ................................... 15

*KSR Int'l Co. v. Teleflex Inc.*
     550 U.S. 398 (2007) ...................................................................................................... 10

*Kyocera Wireless Corp. v. ITC*
     545 F.3d 1340 (Fed. Cir. 2008) ...................................................................................... 16

*Learmonth v. Sears, Roebuck & Co.*
     631 F.3d 724 (5th Cir. 2011) ......................................................................................... 29

*Liner v. J.B. Talley & Co.*
     618 F.2d 327 (5th Cir. 1980) ......................................................................................... 29

*McCann v. Texas City Refining, Inc.*
     984 F. 2d 667 (5th Cir. 1993) ........................................................................................... 3

*Mirror Worlds, LLC v. Apple, Inc.*
     784 F. Supp. 2d 703 (E.D. Tex. 2011) ....................................................................... 3, 15

*Newell Cos., Inc. v. Kenney Mfg. Co.*
     864 F.2d 757 (Fed. Cir. 1988) ........................................................................................ 11

*Northpoint Tech., Ltd. v. MDS Am., Inc.,*
     413 F.3d 1301 (Fed. Cir. 2005) ...................................................................................... 27

*Parklane Hosiery Co. v. Shore*
     439 U.S. 322 (1979) ...................................................................................................... 22

*Rothman v. Target Corp.*
     556 F. 3d 1310 (Fed. Cir. 2009) ..................................................................................... 12

*Schumer v. Lab. Computer Sys.*
     308 F.3d 1304 (Fed. Cir. 2002) ................................................................................ 14, 15

*Sibley v. Lemaire*
     184 F.3d 481 (5th Cir. 1999) ......................................................................................... 27

*Smith v. Transworld Drilling Co.*
     773 F.2d 610 (5th Cir. 1985) ......................................................................................... 26

*Spreadsheet Automation Corp. v. Microsoft Corp.*
     587 F. Supp. 2d 794 (E.D. Tex. 2008) ............................................................................ 12

*Wyers v. Master Lock Co.*
    616 F. 3d 1231 (Fed. Cir. 2010)........................................................................ 11

*z4 Techs., Inc. v. Microsoft Corp.*
    507 F. 3d 1340 (Fed. Cir. 2007)........................................................................ 27

**Other Authorities**

*Restatement (Third) of Law Governing Lawyers* § 107 (2000);
    Jacob Stein, Closing Arguments, § 1:14 (2d ed. 2005) .................................... 20

**Rules**

Federal Rule of Civil Procedure 50(a)............................................................... 2, 3, 5, 17
Federal Rule of Civil Procedure 50(b)............................................................... 2, 30
Federal Rule of Civil Procedure 59 .................................................................. 26, 30

**INTRODUCTION**

After a focused invalidity trial, featuring persuasive testimony from credible witnesses and extensive prior art documentation, the jury rejected Plaintiffs' fantastic contention that Dr. Doyle and colleagues invented the "interactive web."  *See* 2/6PM Tr. 92:15-17.  In their post-verdict motions, Plaintiffs do *not* question that the Court properly instructed the jury on the many invalidity grounds presented at trial.  Plaintiffs' argument instead focuses on their fact-bound argument that "no reasonable juror" could have found invalidity under Section 102(a), (b), (g) *or* Section 103 based on the Viola prior art references, MediaView, *or* Mosaic and HTML+.  Because substantial evidence supporting *any* invalidity ground supports the jury's general verdict, and because Defendants submitted overwhelming evidence on a host of invalidity grounds, Plaintiffs' motion falls short of the mark.

Indeed, Plaintiffs barely address two *independent* invalidity grounds: (1) obviousness based on MediaView with HTML+ and (2) obviousness based on Mosaic with HTML+.[1]  Instead of addressing each invalidity ground supporting the verdict, Plaintiffs focus on Viola, crediting their own evidence while ignoring unfavorable evidence.  While Viola was the subject of much testimony to establish that it qualified as invalidating prior art, MediaView and Mosaic were also at the heart of Defendants' invalidity case, and Plaintiffs' failure to address those invalidity grounds adequately is dispositive of its motion.  In any event, as demonstrated below, there is ample evidence for a reasonable jury to find the asserted claims anticipated and obvious based on Viola.

Importantly, many of Plaintiffs' JMOL arguments were not presented pre-verdict and are thus waived.  Regardless, none are sufficient to carry Plaintiffs' heavy burden of showing, for

---

[1] Because both MediaView/HTML and Mosaic/HTML are virtually ignored by Plaintiffs even though evidence of either of these references invalidates the disputed claims, they are addressed first below, followed by the overwhelming invalidating Viola evidence.

*every* invalidity ground, why the evidence was insufficient to support the jury's verdict. Plaintiffs' attempt to overturn the jury verdict should be rejected.

Finally, Plaintiffs have not met their heavy burden to show why a new trial should be granted. Plaintiffs' speculation that the jury verdict was the result of the jury's belief that inventions should be "free of charge" to the public is unsupported by the record. Defendants' witnesses explained that their prior art contributions *were already in* the public domain, not that the Plaintiffs' inventions *should now be* dedicated to the public domain. To avoid any risk of juror confusion on this point, at the Plaintiffs' request, the Court instructed the jury that it should not "invalidate a patent merely because you believe the invention should be dedicated to the public." Defendants' counsel highlighted this instruction to the jury in closing argument. There simply is no reason to believe that the jury defied the Court's instruction. And there is no other reason to grant a retrial. Plaintiffs' Rule 59 motion should be denied.

## RESPONSE TO PLAINTIFFS' STATEMENT OF ISSUES

1.    Whether JMOL should be granted where there was legally sufficient evidence supporting the jury's verdict that the asserted patent claims are invalid. (No.)

2.    Whether a new trial should be granted where the jury's verdict is clear, supported by the great weight of the evidence, and without error. (No.)

## ARGUMENT

## I.    PLAINTIFFS' RENEWED REQUEST FOR JMOL SHOULD BE DENIED

### A.    Plaintiffs' Motion Includes Grounds Not Preserved Under Rule 50(a)

"If a party fails to move for judgment as a matter of law under Federal Rule of Civil Procedure 50(a) on an issue at the conclusion of all of the evidence, that party waives both its right to file a renewed post-verdict Rule 50(b) motion and also its right to challenge the sufficiency of the evidence on that issue on appeal." *Flowers v. S. Reg'l Physician Svcs., Inc.*,

247 F.3d 229, 238 (5th Cir. 2001).[2]   Neither Plaintiffs' oral nor written motions under Rule 50(a) raised the sufficiency of evidence arguments that Plaintiffs now raise.   Plaintiffs' oral motion alleged only a lack of evidence (corroboration) of the public use of Viola under §§ 102(a)-(g).   It failed to identify any grounds *whatsoever* for the other prior art Defendants presented at trial.   2/8AM Tr. 137:19-155:14.   Nor are Plaintiffs' newly-raised grounds found in their written Rule 50(a) motion, such as the alleged insufficiency of claim elements they now allege are missing in MediaView.   Dkt. No. 1338.   Indeed, that motion contained only conclusory allegations of insufficiency that lumped Defendants' invalidity defenses together in an undifferentiated fashion.   Dkt. No. 1343 at 3, 7.   All it contained as regards to MediaView is that *every* prior art reference failed to disclose *every* element and could not be combined.   *Id.*

The prerequisite of a pre-verdict JMOL would be an empty letter if that kind of "cover the waterfront" boilerplate were sufficient.   Plaintiffs' pre-verdict motion certainly failed to provide notice of the particular evidentiary deficiencies now being alleged post-verdict.

## B.   Legal Standard: JMOL Must Be Denied If There Is Sufficient Evidence To Support Any One Theory of Invalidity

"Judgment as a matter of law is only appropriate when 'a reasonable jury would not have *a* legally sufficient evidentiary basis to find for the party on that issue.'"   *E.g.*, *Mirror Worlds*, 784 F. Supp. 2d at 710 (quoting Fed. R. Civ. P. 50(a)).[3]   "A general jury verdict of invalidity should be upheld if there was sufficient evidence to support any of the alternative theories of invalidity."   *Cordance Corp. v. Amazon.com, Inc.*, 658 F.3d 1330, 1339 (Fed. Cir. 2011).   "The jury's verdict is afforded great deference, and a post-judgment motion for judgment as a matter

---

[2]   Noncompliance is permitted only when the court and parties are alerted to the grounds on which the moving party contends the evidence is insufficient.   *See, e.g.*, *McCann v. Texas City Refining, Inc.*, 984 F.2d 667, 671-72 (5th Cir. 1993).   A Rule 50(a) motion must "put the opposing party on notice of the moving party's position as to the insufficiency of the evidence."   *Mirror Worlds, LLC v. Apple, Inc.*, 784 F. Supp. 2d 703, 711 (E.D. Tex. 2011).

[3]   All emphasis supplied except where noted otherwise.

of law should be granted only when 'the facts and inferences point so strongly in favor of the movant that a rational jury could not reach a contrary verdict.'"   *Frazier v. Honeywell Int'l, Inc.*, 518 F. Supp. 2d 831, 835 (E.D. Tex. 2007) (Davis, J.) (citations omitted).

### C.   There Is Substantial Evidence For A Reasonable Jury To Conclude The Patents Are Obvious Based On MediaView

At trial, Defendants featured MediaView in their invalidity case by using the inventor of MediaView, Dr. Richard Phillips, as their technical expert.   *See, e.g.*, 2/8AM Tr. 75:4-12, 37:6-38:2.   Dr. Phillips' explanation [4] of why MediaView invalidates the patents-in-suit was supported by Mr. Daniel Sadowski, who witnessed MediaView in public use, as well as several articles published by and about Dr. Phillips in 1990-93, the source code for MediaView, a video demonstration of MediaView created in 1993 (JDX 121, which is itself prior art), and other prior art demonstrations.   *See, e.g.*, 2/8AM Tr. 29:18-30:5, 31:22-34:18, 37:6-38:2, 43:22-24, 62:19-78:20, 123:9-17, 124:4-7 (Dr. Phillips, testifying about MediaView); 2/7PM Tr. 183:9-184:21, 185:17-19 (Mr. Sadowski, describing conference where MediaView was demonstrated and distributed on CD); JDX 5, 6, 7, 145, 210, 269 (1990-92 publications detailing MediaView); JDX 121 (1993 video demonstration and audio voiceover describing operation of MediaView); JDX 184 (1992 distributed CD containing software and MediaView source code); DDEM 139-179 [Ex. 1] (Dr. Phillips' presentation to jury, including limitation-by-limitation analysis and excerpting evidence relating to MediaView).   The MediaView prior art was never considered by the Patent Office.   *See, e.g.*, 2/8AM Tr. 67:6-8, 122:23-123:17; 2/8PM Tr. 89:10-18.

Despite this wealth of evidence, Plaintiffs' motion largely ignores MediaView, spending little more than a page on it.   But the MediaView record is overpowering.   Dr. Phillips went through an element-by-element claim analysis at a source-code level showing why the claims

---

[4] Plaintiffs incorrectly estimated the time that Dr. Phillips testified.   The record reflects that Dr. Phillips testified for an entire morning session of 2/8/12 on invalidity, including his analysis of MediaView, Viola, Mosaic, and HTML+.

were invalid.  2/8AM Tr. 31:15-21, 62:19-78:20; DDEM 139-179 [Ex. 1].  He provided three examples of MediaView using his 1993 video, which itself is prior art and evidences the elements of each of the claims, including automatically embedding interactive content into a browser window, and simultaneously described how he did so in the voice recording.  2/8AM Tr. 31:25-34:18; JDX 121.  This is supported by the MediaView source code used in the prior art video.  It is further supported by extensive testimony from those skilled in the art who testified that embedding interactive objects was known and obvious.  *See, e.g.*, 2/6PM Tr. 186:4-188:8, 192:13-195:6 (Bina); 2/7AM Tr. 57:25-58:22 (Berners-Lee); *id.* at 110:18-111:6 (Raggett); 2/8AM Tr. 37:6-38:2 (Phillips).

In the face of this extensive evidence, Plaintiffs narrowly focus on two complaints regarding Dr. Phillips' testimony that they ignored at trial and again in their Rule 50(a) motions (and thus waived as explained above).  Dkt. No. 1338 at 7; 2/8AM Tr. 155:6-14; 2/8PM Tr. 54:12-59:8.  First, Plaintiffs vaguely assert that MediaView is "missing multiple limitations" because Dr. Phillips allegedly never explained "how" MediaView satisfies the "embed text format" and "type information" elements.  Mot. at 19-20.  But Plaintiffs concede that Dr. Phillips did explain that MediaView provides an "embed text format" using the "ViewCell" example and satisfies the "type information" limitation using the "TIFF button" example.  *Id.* at 20 (citing 2/8AM Tr. 69:24-70:14, 71:1-73:21).  Instead, the motion raises four "how" questions for which Dr. Phillips allegedly "offered no explanation."  *Id.* at 20.

Dr. Phillips explained how MediaView satisfied each limitation by identifying the "ViewCell" and "TIFF button" code (among other examples) and by showing actual demonstrations in the prior art video.  2/8AM Tr. 31:22-34:18, 62:19-78:20 (Dr. Phillips, showing excerpts from and discussing JDX 121 (video) and 184 (code)); *see also* DDEM 139-179 [Ex. 1].  The MediaView source code and articles—all of which Dr. Phillips expressly

referenced, quoted from, and explained to the jury—provide further explanation of how MediaView operated, including the four questions raised in Plaintiffs' brief. *See, e.g.*, JDX 5, 6, 7, 145, 210, 269. The video demonstration, on top of the source code description, conclusively answers any reasonable question about whether there is substantial evidence to support the verdict:

(1) "the 'ViewCell' embed text format specifies the location of at least a portion of an object"—*see, e.g.*, 2/8AM Tr. 70:4-11 ("And what we're seeing here is the word view cell. . . . It's the embed text format."); JDX 5 at 7 (explaining how "View Cell . . . implements the methods needed for . . . writing/reading multimedia components to and from files"); JDX 7 at 3-4 & fig. 3 (same); 2/8AM Tr. 71:1-14 (explaining how fig. 4 of JDX 5 is a "perfect example" of how the "specifying the location of the object" limitation is satisfied and "talks about" how "object data" is "read in" and "displayed graphically"); JDX 5 at 5 & fig. 4 (describing how "MediaView builds the animation dynamically" by specifying the location of data contained in various external "*.obj" and "*.anm" files); 2/8AM Tr. 70:12-25 (describing how limitation is disclosed in JDX 7 and explaining that "view cell" "incorporate[s] an embedded entity anywhere in a line" by "keep[ing] track of every single position . . . where an embedded entity is stored").

(2) "the 'TIFF button' type information is used to identify and locate executable applications"—*see, e.g.*, 2/8AM Tr. 71:15-25, 72:1-15 (explaining how "TIFF button is in this case the type information that MediaView uses" and that JDX 5 discloses how that "links to an external program, which is called Mathematica"); JDX 5 at 3 (explaining how Mathematica is an example of an executable application that MediaView can identify and locate); JDX 184 (source code

containing "tiffButton" code for Mathematica example); DDEM 161, 162, 174 [Ex. 1] (excerpting code containing tiffButton and article discussing Mathematica example).

(3)    "the 'TIFF button' type information is associated with objects"—*see, e.g.*, 2/8AM Tr. at 71:15-25 (explaining that "TIFF button is in this case the type information that MediaView uses for that embed text format [ViewCell]"); JDX 7 at 7 (explaining how in MediaView "Button" type information may be associated with the "ability to play a sound, display an image, (primary and alternate), and the specification of an action method"); JDX 5 at 5 (explaining example where "MediaView's image-based animation tool operates on a temporally ordered set of tagged image-file format (TIFF) files"); JDX 121 (video demonstration showing animations (objects) created from TIFF files);

(4)    "MediaView invokes an executable application in response to the identifying of the "ViewCell" embed text format"—*see, e.g.*, 2/8AM Tr. 72:1-15 (explaining that JDX 5 discloses example of how MediaView "links to" external executable application); JDX 5 at 3 ("[A]pplications [] communicate easily through programmable ports, which is how MediaView talks to the Mathematica application."); JDX 7 at 3-4 & fig. 3 (explaining how ViewCell "implements the methods needed for . . . writing/reading multimedia components to and from files"); DDEM 162 [Ex. 1] (excerpting JDX 5).

Plaintiffs question in a footnote Dr. Phillips' examples for the "identif[ying] and locat[ing] an executable application external to the file" and "automatically invok[ing] the executable application" limitations.   Mot. at 20 n.8.   Plaintiffs do not contest, however, that the "3-dimensional Dataset Viewer" (what Plaintiffs term "3D line viewer") example demonstrated

MediaView's capability to "automatically invoke" that executable application.   2/8AM Tr. 72:16-73:21 (discussing JDX 6 as example that discloses automatically invoking by describing a "3-dimensional Dataset Viewer" that "dynamically loads [] information" where the "user doesn't have to start anything up"); DDEM 164 [Ex. 1] (excerpting JDX 6); JDX 6 at 5, fig. 3 (describing "three-dimensional view" "custom component" that can be "dynamically loaded when it is first referenced").   Nor do Plaintiffs contest that the "Mathematica" or "live equation" example demonstrated MediaView's ability to identify and locate those executable application which are "external to the file."   2/8AM Tr. 72:1-15 (explaining how JDX 5 discloses an example of how MediaView "links to an *external* program, which is called Mathematica"); DDEM 162 [Ex. 1] (excerpting JDX 5); JDX 5 (describing communication with external Mathematica application).   Dr. Phillips provided other uncontested evidence that MediaView satisfied these limitations.   *See, e.g.*, 2/8AM Tr. 72:16-73:21 (explaining how MediaView can "cause [executable applications] to play themselves or push their own buttons," "which means automatic invocation"); DDEM 163 [Ex. 1] (excerpting JDX 7); JDX 7 (discussing how MediaView allows "multimedia components" to "play themselves or push their own buttons"); JDX 5 at 3-7 (discussing how MediaView can load external files); JDX 121 (video demonstrations).

Moreover, these limitations need only have been obvious in light of the prior art.   The two examples Dr. Phillips discussed, combined with the other testimony, source code, videos, articles, and evidence cited above, certainly confirm that it would have been obvious to combine features from one MediaView application with another using common sense, and that in all events MediaView was capable of performing both limitations simultaneously.   *See, e.g.*, 2/8AM Tr. 37:25-38:2.

In any event, Plaintiffs' mere questioning of Dr. Phillips' explanations is insufficient to

carry their heavy burden.  There is no requirement that Dr. Phillips must recursively explain "how" each component and sub-component part works after he has pinpointed specific examples in both the prior art source code and articles and shown video demonstrations.  Even if Plaintiffs' "how" questions were relevant, Plaintiffs could have questioned Dr. Phillips about them, but did not.  Nor did they present contrary evidence from their own expert.  *See* 2/8PM Tr. 54:12-59:8.

Plaintiffs' second argument concerns the combination of MediaView with either hyperlinks or the CERN web browser to satisfy the "HTML tags" limitation.  Eolas's attack rests entirely on Dr. Phillips' statement that he never personally combined MediaView with the CERN browser.  But whether references that are proven obvious to combine were ever actually combined by the expert cannot be, as Plaintiffs assert, "the most relevant and powerful" evidence of obviousness, Mot. at 20, as that would eviscerate the very concept of obviousness.  If they had actually been combined into a single reference, that would establish anticipation.

Moreover, Plaintiffs do not contest the overpowering evidence that this combination was indeed obvious, including in particular Dr. Phillips' 1991 publication in which he expressly states that it was "***most obvious***" to implement "hyperlinking" in MediaView, which would necessarily involve HTML (*i.e.*, hypertext markup language) tags).  JDX 7 ("The most obvious and most important enhancement is a hyperlinking capability.").  Dr. Phillips repeatedly directed the jury to this article and read aloud and explained its significance:

> Q. . . . Now, would using HTML tags have been obvious, based on an article that you wrote about MediaView in 1991?
>
> A. Yes. I point out that the most obvious enhancement to MediaView when I first wrote it is to add a hyperlinking capability, which would involve HTML tags.

*See* 2/8AM Tr. 74:17-75:12; DDEM 144 [Ex. 1], 173 (excerpting JDX 7); *see also* 2/8AM Tr. 35:13-38:2, 75:4-12 (explaining how combining MediaView with CERN web browser that used

HTML to achieve "full HTML capability" would have been obvious and trivial).   Thus, there is ample evidence of a teaching and motivation to combine MediaView with a web browser (what Plaintiffs call the "highly relevant TSM test," Mot. at 21[5]).

### D.   There Is Substantial Evidence For A Reasonable Jury To Conclude The Patents Are Obvious In Light Of Mosaic and HTML+

At trial, Defendants presented testimony from the co-inventor of Mosaic, Eric Bina, as well as the inventor of HTML+, Dave Raggett, to establish that Mosaic combined with HTML+ renders the claims-in-suit obvious.   Their testimony established that using a web browser like Mosaic to view embedded interactive objects was already known and obvious.   *See, e.g.*, 2/6PM Tr. 177:14-16, 186:4-188:8, 192:13-195:6 (Bina); 2/7AM Tr. 97:13-15, 110:18-111:6 (Raggett); *see also* 2/7AM Tr. 57:25-58:22 (Berners-Lee). Yet, Plaintiffs' motion myopically focuses on Viola and fails to address the obviousness evidence based on Mosaic in combination with HTML+, except for a single sentence buried in a footnote.   Mot. at 18 n.7.   That footnote concedes, however, that Dr. Phillips testified that it would have been obvious to combine Mosaic with HTML+.   *Id.*; *see* 2/8AM Tr. 35:13-38:2.   Dr. Phillips' opinion is supported by Mr. Bina's testimony that he wrote more than 98% of the Mosaic source code and that his Mosaic code already anticipated embedding interactive content directly into web pages.   2/6PM Tr. 192:22-195:6.   JDX 79A (Bina's Mosaic code with interactive map code and mpeg video code),2-1:19-203:19 JDX 79B (Bina's interactive jot signature code), 207:12-211:24, JDZ 271 (same Mosaic interactive map, mpeg and jot code that Plaintiffs submitted to Patent Office.).   Moreover, before Eolas even alleges conception, Dr. Raggett himself had already proposed an EMBED tag in his HTML+ specification that was substantively identical to the EMBED tag that appears in

---

[5]   Contrary to Plaintiffs' suggestion, the Supreme Court has rejected the so-called "TSM test." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 414-16 (2007).   The Court "must ask whether the improvement is more than the predictable use of prior art elements according to their established functions." *Id.* at 417; *see id.* at 421 (obviousness may be proved through common sense or "merely by showing that the combination of elements was 'obvious to try'").

Plaintiffs' patents.  *See* 2/7AM Tr. at 100:16-21, 105:7-11.  Mr. Raggett's proposal filled any gap between the cited Mosaic prior art and the claims-in-suit.  *See, e.g.*, *id.* at 97:13-15, 103:23-104:1, 105:7-10; JDX 119, 42, 35, 152; PX 3.  That is, where Plaintiffs' alleged invention was simply a modification of Mosaic to read a custom tag denoted "EMBED," the jury could understand for itself using common sense that Dr. Raggett's earlier HTML+ already disclosed this same purported invention, an "EMBED" tag.  This uncontested evidence supports the verdict that the patents are obvious in light of Mosaic, either alone or in combination with HTML+.

### E.    Plaintiffs' Secondary Considerations Showing Provides No Basis For JMOL

Plaintiffs' motion re-hashes its weak secondary considerations showing in an attempt to overcome Defendants' invalidity showing.[6]   Plaintiffs imply that the mere presence of secondary indicia can "preclude[] any finding of obviousness." Mot. at 2.  To the contrary, "secondary considerations of nonobviousness . . . cannot overcome a strong prima facie case of obviousness."  *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1246 (Fed. Cir. 2010); *see, e.g.*, *Agrizap, Inc. v. Woodstream Corp.*, 520 F.3d 1337, 1344 (Fed. Cir. 2008) ("Even when we presume the jury found that the objective evidence of nonobviousness favored Agrizap, this evidence is insufficient to overcome the overwhelming strength of Woodstream's prima facie case of obviousness."); *Dystar Textilfarben GmbH & Co. v. C.H. Patrick Co.*, 464 F.3d 1356, 1371 (Fed. Cir. 2006) ("The presence of certain secondary considerations of nonobviousness are insufficient as a matter of law to overcome our conclusion."); *Newell Cos., Inc. v. Kenney Mfg. Co.*, 864 F.2d 757, 768 (Fed. Cir. 1988) (secondary considerations "do not control the

---

[6]  It is improper for Plaintiffs to attempt to rely on unadmitted material (for example, Plaintiffs' brief cites a non-admitted PTO Gazette reference, Mot. at 22 n.9) or newly re-characterize the admitted evidence (for example, the brief tries to re-cast the testimony of the prior artists and fact witnesses as evidence of "failure of others," *id.,* which was plainly incorrect.  2/6PM Tr. 204:16-208:24).

obviousness conclusion").[7]

Plaintiffs assert that the Court abused its discretion by excluding settlement agreements. But the Court rightly exercised its discretion because the unfair prejudice that would arise from admitting compromise settlements far outweighed any possible probative value in the specific context of this case and would have created collateral disputes concerning each such settlement. 2/8PM Tr. 15:13-22; *see* Fed. R. Evid. 403; *Honeywell Int'l, Inc. v. Nikon Corp.*, No. 04-1337-JJF, 2009 U.S. Dist. LEXIS 17115, at *7-8 (D. Del. Mar. 4, 2009) (affirming exclusion of settlements as evidence of commercial success).   Settlements may indicate, for example, a party's unwillingness to incur litigation risk and costs, rather than acquiescence to patent validity.   *See Spreadsheet Automation Corp. v. Microsoft Corp.*, 587 F. Supp. 2d 794, 800 (E.D. Tex. 2007) ("Many considerations other than the value of the improvements patented may induce payment in such [settlements].   The avoidance of risk and expense of litigation will always be a potential motive for a settlement." (citations omitted)).   Indeed, the settlements contain explicit language noting that the parties did not affirm the validity of the patents-in-suit.   *See, e.g.*, Dkt. No. 1273 at 2.   Nor have Plaintiffs established a nexus between those settlements and the asserted claims.   *Iron Grip Barbell Co., Inc. v. USA Sports, Inc.*, 392 F.3d 1317, 1324 (Fed. Cir. 2004); *see also In re GPAC Inc.*, 57 F.3d 1573, 1580 (Fed. Cir. 1995) ("Because . . . GPAC did not establish **which claim(s)** of the patent the licensing program incorporates, GPAC has not shown that licensing of Natale's invention arose out of recognition and acceptance of the subject matter claimed in the '111 patent.").

Admission of the settlements also would have invited collateral mini-trials on the merits

---

[7] Plaintiffs' citations also hold the opposite of their contention.   *See* Mot. at 18 (citing *Rothman v. Target Corp.*, 556 F.3d 1310, 1321-22 (Fed. Cir. 2009) ("[T]his court must presume that the jury adequately weighed this factual evidence and found it insufficient to support a finding of validity.   Indeed, a strong prima facie obviousness showing may stand even in the face of considerable evidence of secondary considerations.").

of each of the settled infringement claims, and on the differences between the accused products of Defendants and those of the settling parties.   Such admission also would have suggested that settling defendants were acknowledging the validity of the patents when there is no reason to believe they were.   Plaintiffs' unsupported assertion that the "only prejudicial effect" "was to suggest that the claims were valid" is therefore incorrect.[8]   The Court correctly exercised its discretion to exclude the litigation settlements.

### F.    Plaintiffs' Arguments Regarding Viola Are Incorrect and Irrelevant

#### 1.    There Is Substantial Evidence For A Reasonable Jury To Find The Patents Anticipated By Viola

There is substantial evidence that Viola anticipates the asserted claims.   This includes the limitation-by-limitation analysis of Dr. Phillips.   *See, e.g.,* 2/8AM Tr. at 29:3-29:17, 30:6-17-40:2, 42:18-62:18, 67:9-11, 78:2-24, 123:3-8, 127:16-25; DDEM 138 [Ex. 2].   It also includes the testimony of Messrs. Tim Berners-Lee, Eric Bina, David Raggett, Karl Jacob, and Scott Silvey, in addition to the creator of Viola himself, Mr. Pei Wei, all of whom confirmed that Viola disclosed the claimed inventions before September 7, 1993 (Plaintiffs' unsubstantiated and uncorroborated alleged date of conception), October 16, 1993 (one year before the patent filing date), and October 17, 1994 (Plaintiffs' priority date proved at trial, based on evidence that the earliest proof of conception was its patent application[9]).   *See, e.g.*, 2/6PM Tr. 197:8-202:8 (Bina, recalling elements of Viola demonstrated at July 1993 WWW Wizards Conference

---

[8]   As explained in Defendants' Motion *in Limine*, the settlements were also properly excluded because Plaintiffs repeatedly denied Defendants' attempts to obtain discovery needed to test the comparability of these licenses—that is, to test the nexus requirement.   *See* Dkt. No. 1189 at 4-6.   And as explained at oral argument, admission of the settlements would be inconsistent with several of the motions *in limine* and stipulations that Plaintiffs themselves sought and obtained.   *See* 2/8PM Tr. at 7:9-9:22.

[9]   The record shows the claimed inventions were not conceived in September 1993 and therefore deserved at the earliest an October 17, 1994 priority date.   Indeed, it would have been legal error for the jury to have accepted Plaintiffs' priority claim.   *See, e.g.*, PX 21 (notebook page relied upon for conception date); 2/6PM Tr. 161-162 (Doyle, inventor admitting PX 21 is missing "embed text format," "browser," "hypermedia documents," user interaction, embedded interactive objects, and other limitations); 2/8AM Tr. 40-42 (Dr. Phillips, opining that notebook fails to evidence conception of at least "embed text format," "browser," "hypermedia documents," "type information" and "automatically invoke").

("WWWWC")); 2/7AM Tr. 55:4-58:2 (Berners-Lee, discussing demo at WWWWC); *id.* at 110:18-111:9, 116:10-117:4 (Raggett, discussing same); 2/7PM Tr. 7:16-25:4 (Silvey, recalling May 7, 1993 demo to Sun, May 7, 1993 demo to Usenix, and July 1993 demo at WWWWC); *id.* at 71:1-75:13, 78:8-80:5, 85:19-86:12 (Wei, describing publication of Viola source code to others by FTP and various demos); *id.* at 174:1-177:21 (Jacob, recalling May 7, 1993 demo).

It also included the source code admitted into evidence, including that authenticated by Mr. Silvey and Mr. Wei.   *See, e.g.*, JDX, 272 (Oct. 16, 1993 Viola code), 274 (May 12, 1993 Viola and May 7, 1993 Vplot code), 276 (July 30, 1992 Viola code), 290 (Oct. 16, 1993 Viola code), 291 (May 7, 1993 Vplot code), 292 (May 12, 93 Viola code), 293 (Aug. 12, 1993 Vplot code), 295 (May 27, 1993 Viola code); 2/7PM Tr. 27:21-32:9, 69:22-70:25 (Silvey and Wei, authenticating code).   Other documents corroborate that Viola invalidated every element of the claims at issue:   emails between Mr. Wei and the named inventor of the patents, Dr. Doyle, *see, e.g.*, JDX 58, 61, 234, and 235; emails between Mr. Wei and others in the industry, including the father of the World Wide Web and inventor of HTML, Mr. Berners-Lee, *see, e.g.*, JDX 10; and articles and other documents about Viola, *see, e.g.*, JDX 16, 30, 56, 57, 95, 237, 258.

Ignoring the overwhelming weight of this evidence, Plaintiffs focus narrowly on Dr. Phillips' testimony, incorrectly suggesting that only an expert can provide testimony relevant to anticipation or obviousness.   Mot. at 5; *see* Part I.C *supra* (citing cases).   Plaintiffs' citation, *Function Media*, states the uncontroversial proposition that such testimony may be necessary for certain complex issues.   It does not suggest that the fact-finder should discount the great weight of evidence beyond expert testimony.   Indeed, in that case this Court upheld the jury's verdict of invalidity based on expert testimony "***together with other evidence in the record***." *Function Media, L.L.C. v. Google, Inc.,* No. 2:07-CV-279, 2011 U.S. Dist. LEXIS 101998, at *9 (E.D. Tex. Sept. 9, 2011).   Even more unavailing is *Schumer*, which simply notes what testimony

experts "typically" provide.[10]

Accordingly, Plaintiffs' assertion that those skilled in the art at the relevant time "could not speak to" the prior art references but instead testified "regarding other technology," Mot. at 1, misstates the purposes and nature of that testimony. The testimony of the creator of Viola and other persons of skill in the art who witnessed it in operation, together with the other admitted evidence including source code, correspondence, and articles, all support the verdict. Contrary to Plaintiffs' complaint that "no witness had explained these exhibits to the jury," *id.* at 3, the above citations demonstrate that is precisely what the fact witnesses did. In any event, Dr. Phillips' element-by-element analysis of Viola was more than sufficient to support a finding of anticipation. *See, e.g.,* 2/8AM Tr. 29:3-29:17, 30:6-40:2, 42:18-62:18, 67:9-11, 78:2-24, 123:3-8, 127:16-25; DDEM 138 [Ex. 2].

### 2. The Record Supports A Finding That Viola Is A Single Reference

Plaintiffs first contend that Dr. Phillips' limitation-by-limitation analysis was inadequate because, "as a matter of law, distinct versions of the Viola code that had been modified over time could not constitute a single reference for anticipation purposes." Mot. at 1-2, 5-6.[11] But in Plaintiffs' case against Microsoft the Federal Circuit rejected a similar attempt to treat different versions of Viola separately. *Eolas Techs. Inc. v. Microsoft Corp.*, 399 F.3d 1325, 1333-34

---

[10] On summary judgment, the court had to render its decision solely on the basis of an expert declaration, where it was "not [the court's] task" to attempt to interpret the expert's testimony. *Schumer v. Lab. Computer Sys.*, 308 F.3d 1304, 1316 (Fed. Cir. 2002). That is, of course not the record here. The other cases cited by Plaintiffs are likewise inapposite. *See* Mot. at 5 (citing *Koito Mfg. Co. v. Turn-Key-Tech, LLC*, 381 F.3d 1142, 1151 (Fed. Cir. 2004) (party had "merely submitted that reference into evidence and made no specific mention of it at trial," which is not the case here where Defendants offered fact and expert testimony, and also noting that other references not evaluated by district court could support finding of invalidity); *Krippelz v. Ford Motor Co.*, 667 F.3d 1261, 1268-69 (Fed. Cir. 2012) (finding expert testimony insufficient to raise issue regarding whether a prior art reference anticipates and therefore reversing denial of JMOL of invalidity, which is the opposite of what Plaintiffs seek here); *Mirror Worlds*, 784 F. Supp. 2d at 710-11 (granting defendant's JMOL on non-infringement and addressing expert testimony in the context of doctrine of equivalence only, and denying JMOL on invalidity).

[11] Even if correct, distinct versions of Viola Code still render the patents anticipated and obvious.

(Fed. Cir. 2005) (code version is "not an entirely new invention").   Moreover, the cases Plaintiffs cite provide no support for Plaintiffs' proposition; indeed, one case Plaintiffs cite, *i4i*, supports the opposite.   In that case the parties presented conflicting testimony concerning a computer program, "Rita," and for purposes of judging the sufficiency of that evidence the Court properly "assum[ed] the amalgam of Rita references were a single prior art reference . . . ."   *i4i Ltd. P'ship v. Microsoft Corp.*, 670 F. Supp. 2d 568, 586-87 (E.D. Tex. 2009).   Likewise, the *Kyocera* case found different specifications to constitute multiple references only where "***[t]he record evidence suggests*** that the GSM standard is not a single reference" because the specifications "were authored by different subsets of authors at different times."   *Kyocera Wireless Corp. v. ITC*, 545 F.3d 1340, 1351 (Fed. Cir. 2008).

Viola is distinguishable.   There is ample evidence that confirms it was developed by the same individual over a continuous period such that the jury could conclude that it was a single reference.   *See, e.g.*, 2/8AM Tr. 38:3-40:2 (Phillips, opining one of ordinary skill at the time would consider Viola a single reference and that it would be obvious to use different applications and code bases from the different releases together).

Regardless, Plaintiffs' assertion that Dr. Phillips failed to consider the Viola code bases "one at a time on their own merit" is false.   Mot. at 7.[12]   For example, as noted above, there was substantial evidence for the jury to conclude that the earliest priority date for the patents was not until October 17, 1994.   Accordingly, a single version of Viola—Alpha, packaged and dated October 16, 1993—anticipated and rendered obvious all of the elements of the asserted claims under §§ 102(a), (b), and (g) and was never submitted to the Patent office.   JDX 290. Plaintiffs' complaint that Dr. Phillips did not "point to any Viola evidence in the admitted

---

[12] Plaintiffs' reliance on Dr. Phillips' statements at deposition are irrelevant.   There is solid evidence that the May 1993 Viola demonstrations disclosed HTML tags.   *See* Part I.F.3.d *infra*.   Plaintiffs' contention that Vplot was "abandon[ed]" in Alpha is likewise unavailing, as discussed further below.   *See* Part I.F.3.b *infra*.

exhibit" (Mot. at 3) is likewise false, as he testified that he considered all of the testimony presented and source code admitted before he testified.  *See, e.g.*, 2/8AM Tr. 29:6-13, 39:18-40:2 (he studied and ran unmodified Viola code, including specifically Viola Alpha and May 1993 Viola code).

### 3. There Is Substantial Evidence For A Reasonable Jury To Find That Viola Discloses The Asserted Claims

Plaintiffs contest the presence in Viola of four limitations.   As detailed below, the record is replete with evidence sufficient for a jury to find that Viola disclosed each limitation.

### a. "embed text format specifies the location of at least a portion of an object"

Plaintiffs failed to allege that there was insufficient proof of this element in its Rule 50(a) motion.  *See* Dkt. No. 1338 at 5 (listing other allegedly missing elements but not this one). Moreover, neither Plaintiffs nor their validity expert disputed this issue during trial.  As such, it should be denied as waived.   In any event, Dr. Phillips explained that the VOBJF tag in Viola specifies the location of an object by specifying the location of the executable application, which in turn executes and provides the location of the interactive object.   2/8AM Tr. 48:5-15, *cited by* Mot. at 8-9; *see also* 2/8AM Tr. 47:14-48:1 (Phillips).   Moreover, Mr. Silvey also explained how Viola did so.  *See, e.g.*, 2/7PM Tr. 10:17-11:7; (Silvey, Viola tag specify the location of object).   77:15-24 (Weil, VOBJF allows embedded viewer object), *see also* JDX 292, 295, and 290.

### b. "type information to identify and locate"

Four asserted claims do not contain this limitation and thus cannot be affected by this argument.   Regardless, Plaintiffs' brief concedes that Dr. Phillips specifically explained how Viola satisfies the "type" limitation:

> Q. What is the type information in Viola that's used to find the Plot.V executable application that's used to identify and to locate it?

> A. That would be the name, Plot.V, that is at the end of the information after the VOBJF.
>
> Q. And did you find that Plot.V in the prior art code of Viola that you examined this morning?
>
> A. Yes, I did.

2/8AM Tr. 127:16-25, *quoted by* Mot. at 10.   Plaintiffs' assertion that Dr. Phillips provided "no explanation" is further belied by their quotation of Dr. Phillips' explanation.  *See* 2/8 AM Tr. 48:5-19, *quoted by* Mot. at 8.  He answered all the questions Plaintiffs' brief now raises: "how the name of a file could be type information" (by allowing a Viola browser to determine where an executable location can be found); "how it could be used by the browser to identify and locate a particular type of executable application" (by executing a small program that then discovers the larger program); "how it could be associated with the object," (by associating the file name with the small program that launches the larger program); and "where in any particular Viola code base the jury might find a "Plot.V after the VOBJF" (in the VOBJF tag he previously discussed was included in Viola).  *Id.*

Moreover, the jury could properly rely on several fact witnesses, including Mr. Wei and Mr. Silvey, who also explained the operation of Viola with Vplot using the VOBJF tag.  *See, e.g.*, 2/7PM Tr. at 33:14-24 (Silvey, explaining how Viola utilizes the ".V" type information to identify the "Viola object"); 2/7AM Tr. 166:4-25 (Wei, explaining Viola's object type); *see also* JDX 272, 290 at p. 45 (source code containing "type=" information, which Plaintiffs failed to controvert in Mr. Wei's testimony.  2/7PM Tr. 165:11-166:25).  Plaintiffs own expert testified that Viola "operates to perform these functions" of "identifying and locating an executable application," and offered his own explanation "as to how." Mot. at 10-11 n.2.[13]

Plaintiffs demand an "explanation" where none is required—Dr. Phillips, having

---

[13] Dr. Martin's argument that Viola's method of doing so allegedly presented "security issues," Mot. at 11 n.3, while untrue, is irrelevant because there is no "security" requirement.

explained how Viola operates to satisfy the claim element using the type information provided in the VOBJF tag, need not explain recursively "how" each of the component and sub-component parts mentioned in his explanation themselves operate.

Plaintiffs also raise three inapposite arguments.   First, Plaintiffs' reliance on the Examiner's statement fails because it is not dispositive of whether a limitation is disclosed by prior art.   In any event, it is undisputed that the Patent Office never considered the Viola Alpha code, so the Examiner's statement is irrelevant.   *See* Mot. at 9-10; 2/8AM Tr. 67:9-11, 123:3-8; 2/8PM Tr. 93:20-23 (Martin, admitting same).   The jury, after hearing conflicting testimony and considering evidence that the Examiner did not have, determined that Dr. Phillips and supporting evidence were more credible than Dr. Martin.

Second, Plaintiffs' assertion that Vplot was not part of the Alpha version of Viola does not dispute that Alpha was capable of and in fact was used to interoperate with Vplot, as explained by Mr. Wei and Mr. Silvey, in addition to Dr. Phillips.   *See, e.g.*, 2/7PM Tr. at 33:8-13 (Silvey: "Q. Did the October 16th, 1993 Alpha release of the Viola code also contain Plot.V? A. Yes."); *see also id.* 32:10-34:18, 35:4-13 (Silvey, describing how Viola Alpha was capable of being combined with Vplot); Mot. at 11 n.3 (admitting "Scott Silvey testified as a fact witness that the Alpha code contained a reference to Plot.V," and that it had the capability of being "put together" with VPlot).   Nor was Vplot "abandoned," as Plaintiffs contend, and none of the citations Plaintiffs provide state otherwise—in fact, they all indicate that Viola was capable of invoking any number of external executable applications, including Vplot.   *See* 2/8AM Tr. 50:5-7, 2/7PM Tr. 34:3-35:13, *cited by* Mot. at 11.   While Vplot was not included in the Alpha distribution of Viola, the ability to interoperate the two certainly was not abandoned   *See, e.g.*, JDX 293 (Aug. 12, 1993 Vplot code); 2/7PM Tr. 28:20-25.   Indeed, Dr. Phillips, Mr. Wei and Mr. Silvey all testified that it was obvious to use Vplot with Alpha.   *See, e.g.*, 2/8AM Tr. at

96:18-23 (Phillps: "it was obvious to include [Vplot] from previous code bases and from distributions [of Viola] that were made, for example, to the Sun engineers."); 2/7PM Tr. 34:15-18 (Silvey, testifying it would be straightforward to combine the Alpha version of Viola with Vplot).   Moreover, Viola and Viola Alpha contained other interactive applications which provided type information that identified and located part of an object.   *See* JDX 292 at 716 (May 12 Viola has doodle and wave types); JDX 295 at 661 (May 27 Viola contains doodle and wave types), and JDX 290 at 45 and 60 (Viola Alpha containing "type = doodle," and wave type).

Third, Plaintiffs' post-verdict criticism of Defense counsel's statements in closing is irrelevant.   Plaintiffs concede they did not object to these statements at trial.   For good reason. There is nothing improper about reading from admitted evidence, including source code, in closing[14], and there was sufficient testimony, source code, and other evidence, all cited above, to support the jury's finding that Viola disclosed or rendered obvious the "type information" limitation.   Plaintiffs' selective quotation of a small portion of the closing statement is misleading, as counsel did in fact direct the jury to the type information in the admitted source code evidence discussed by the witnesses, and to dispel any doubt it was visible and highlighted on counsel's demonstrative throughout the closing.   *See* 2/9 Tr. 105:22-106:3 ("Type information, and what did [Wei] say?   The object type.   Viola object, that's the type. You know Doodle is one type.   We just saw it.   TYPE= Doodle.   That's what the code teaches.   Volume is one type.   And it's one versus the other.   They do different things.   Of course it had type information."); DDEM 3 [Ex. 3] (showing excerpt of JDX 290 at p. 45).

---

[14]This Court instructed the jury to consider "all exhibits received in evidence" in determining whether a fact is proved in the case, which included JDX 290 from which Defendants' counsel quoted in closing. 2/9 Tr. at 19:14-19; *see e.g., Restatement (Third) of Law Governing Lawyers* § 107 (2000); Jacob Stein, Closing Arguments, § 1:14 (2011-2012 ed.) ("[C]ounsel is restricted to the law in the case, the evidence adduced from the witnesses, the **exhibits admitted into evidence**, and the inferences reasonably deductible from the testimony and exhibits.").

### c.      "distributed application"

Only four claims contain this limitation.   Plaintiffs concede that Dr. Phillips testified that Viola was capable of operating with a distributed application and moreover that it would have been obvious to do so.   2/8AM Tr. 58:9-59:9, *cited by* Mot. at 12.   Plaintiffs thus do not dispute that there was sufficient evidence for a jury to find these claims containing the "distributed application" limitation invalid on the basis of obviousness, even if not for anticipation. Moreover, there was ample other evidence presented at trial from which the jury could find that Viola was capable of invoking a distributed application.   *See, e.g.*, 2/7PM 22:4-15 (Silvey, explaining that Vplot and Viola were designed to run together for a distributed application over a distributed network); 2/7AM Tr. 50:1-14 (Berners-Lee, detailing that Viola, on X Windows, could run a program in one place and have it display in another place); 2/6PM Tr. 195:12-22 (Bina, testifying X Windows was a network program that could run on one computer and, connected across a network, display the data in the window on another computer); 2/8AM Tr. 59:1-9 (Phillips, explaining X Windows is by definition a distributed capability), see also, JDX 295 at p. 1, JDX 295 at p. 383 (May 12, May 27, and October 16, 1993 Viola showing use of X-Windows).

### d.      "HTML tags"

Only five claims contain this limitation.   Plaintiffs simply reiterate their argument at trial that somehow HTML tags were not obvious.   As Plaintiffs concede, Dr. Phillips explained that HTML tags were used to display the hypermedia document in Viola.   2/8AM Tr. 57:10-23, *cited by* Mot. at 13.   His opinion was further buttressed by the source code itself, as well as the testimony of witnesses very familiar with Viola, including the inventor and others who had used or viewed Viola at the time.   *See, e.g.*, 2/7PM Tr. 167:3-16 (Wei, discussing Viola's use of HTML tags); 2/7PM 52:7-11 (Silvey, explaining how Viola works on HTML pages); 2/6PM Tr. 180:11-181:1 (Bina, describing how Viola browser fetched and rendered HTML pages); JDX

274 & 292 at pp.220-94 (May 12, 1993 Viola code, including testall.*html* and **HTML**_vobjf.v); JDX 295 at pp. 294, 403-404 (May 27, 2993 Viola code, including **HTML**_vobjf.v and test**HTML**.v); JDX 290 at pp. 308, 1237-1238 (Oct. 16, 1993 Viola code, including same). Plaintiffs' naked attempt to have the Court re-weigh this evidence is improper on JMOL.

### 4.      There Is Sufficient Evidence For A Jury To Find That Viola Was Publicly Known And Used Under §§ 102(a), (b), and (g)

Plaintiffs contend that there is no proof of "public knowledge or use" of Viola under §§ 102(a) and (b) because successive versions of Viola were not published in a single "compendium."  Mot. at 14.  However, Plaintiffs cite no authority for this position, which conflicts with the Federal Circuit authority from the *Microsoft* case.  In that decision, the Federal Circuit explained that "Wei not only demonstrated [May 12, 1993 and Vplot Viola code] to two Sun Microsystems engineers without a confidentiality agreement (on May 7, 1993), but only twenty-four days later (on May 31, 1993) posted [May 27, 1993 Viola code] on a publicly-accessible Internet site and notified a Sun Microsystems engineer that [the May 27, 1993 Viola code] was available for downloading." *Eolas*, 399 F.3d at 1333.  "Wei's May 7, 1993 demonstration to two Sun Microsystems employees without confidentiality agreements was a public use under section 102(b)."  *Id.* at 1335.  Those versions of Viola and Vplot have been admitted into evidence in this case.  *See* JDX 292 (May 12, 1993 Viola code); JDX 295 (May 27, 1993 Viola code); *see also* JDX 291 (May 7, 1993 Vplot code).  Moreover, they were distributed more than a year before the patents-in-suit.  2/7PM Tr. 97:4-9 (Viola); 2/7PM Tr. 177:5-21 (Vplot).  Plaintiffs should be bound by the decisions in that case to which it was a party.  *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326-31 (1979).

In any event, ample evidence supports the jury's finding that Viola was known or in use before the invention under § 102(a) as well as in publication or public use more than one year before the patent application under § 102(b).  This includes admitted testimony, source code,

and other evidence supporting the jury's finding that Viola was known and publicly used by at least May 7, 1993, when it was demonstrated to Sun and Usenix, and July 1993, when it was demonstrated and released to participants of the WWWWC.  *See, e.g.*, 2/7PM Tr. 78:8-80:5, 80:16-89:11, 85:19-87:6, 127:2-5, 128:15-19 (Wei, testifying he demonstrated Viola multiple times, including on May 7, 1993 to Sun and Usenix and on July 28-30, 1993 at WWWWC, and that Viola was publicly distributed to Sun on May 31, 1993 and to others by FTP on October 16, 1993); *id.* at 172:7-178:20 (Jacobs, testifying he saw "interactive program object embedded in a Web page" in Viola demo); 2/7AM Tr. 55:4-14 (Berners-Lee, noting he witnessed Viola at WWWWC and downloaded it prior to that); JDX 274, 291, 292, 295 (May 12 and 7, 1993 Viola and May 7, 1993 Vplot source code); JDX 10 (Wei email to Berners-Lee); JDX 16 (Wei email to Andreessen); JDX 29 (Dougherty email to Wei regarding May 1993 meeting with Sun); JDX 30 (Dougherty email to O'Reilly corroborating May 7, 1993 demos to Sun and Usenix); JDX 32, 168, 236 (emails between Wei and Kempf sending Viola code); JDX 33 (Kempf email to Wei confirming meeting and possession of Viola code); JDX 35 (Dougherty email regarding WWWWC); JDX 61 (Wei email to Doyle discussing May 8, 1993 Viola demo); JDX 237 (photo corroborating WWWWC attendees); JDX 226 (Dougherty email to Berners-Lee); JDX 227 (Dougherty email to Wei and Silvey); JDX 239 (Dougherty email to Wei confirming Viola sent to Sun).   There was also ample evidence that Viola, specifically the Alpha release dated October 16, 1993, was published and in public use by at least October 17, 1993.  *See, e.g.*, JDX 43 (Wei email to Weber regarding publication of Viola Alpha), JDX 44 (Cahill email to Wei confirming downloading Viola Alpha); JDX 258 (October 14-16, 1993 emails confirming public distribution and use of Viola); JDX 290 (October 16, 1993 Viola Alpha code); JDX 57 (Viola article); JDX 95 (Berners-Lee book discussing Viola).

The same evidence also establishes that, under § 102(g), before the claimed invention of

the patents-in-suit, Viola and Vplot were made in this country by Mr. Wei and Mr. Silvey; that they did not abandon, suppress, or conceal them; and that they were conceived and reduced to practice with reasonable diligence at least as of May 1993 and certainly by October 16, 1993. *See, e.g.*, 2/7PM Tr. 68:25-80:5, 82:5-89:11 (Wei, describing conception, continuous diligence, and reduction to practice of Viola from 1991-93, not experimental use).   Mr. Wei's Viola codebases (which included Viola 3.3 dated 1995), email exchanges, presentations, articles, and public distributions are all evidence of his continued diligence.   *See, e.g.*, JDX 29, 30, 32, 33, 35, 43, 44, 46, 48, 56, 57, 60, 61, 167, 168, 223, 226, 227, 236, 239, 240, 253 (emails, presentations, and articles concerning Viola from 1991-94), JDX 277, 278, 290, 291, 292, 293, 295 (Viola source code).

Plaintiffs' assertion that Viola was abandoned in some way was already rejected by the Federal Circuit, which held, "Eolas' arguments that Wei's changes to the functionality and architecture of [the May 12, 1993 Viola code] show abandonment are unpersuasive because such changes merely reflect improvements in advancing versions of software code."   *Eolas*, 399 F.3d at 1334.   The Federal Circuit thus found that there was no evidence that Viola was abandoned, suppressed, or concealed, and thus satisfies that requirement under § 102(g).   *Id.* at 1333.

Plaintiffs' complaint that Defendants "failed to match up any particular code base with the alleged public demonstrations or distributions" and assertion that the oral testimony of public use is therefore "uncorroborated," Mot. at 15 n.6, is incorrect.   As an initial matter, the admitted code is non-testimonial and thus needs no corroboration.   Nonetheless, there is ample evidence establishing a strong linkage between the admitted source code and the public demonstrations and distributions that the witnesses described, including for example Mr. Silvey's testimony that the May 12, 1993 code was an accurate representation of what he recalled demonstrating to Sun engineers on May 7, 1993.   2/7AM Tr. 160:11-13 (stating May 12, 1993 Viola code is "a clear

and accurate representation of what we presented" to Sun on May 7, 1993); *see also* 2/7PM Tr. 27:21-31:8 (authenticating source code packages); JDX 290, 291, 292, 293, 295 (packages authenticated by Silvey). Additionally, Mr. Wei testified that the October 16, 1993 code and May 27, 1993 code packages were publicly distributed by emails dated within a day of those codebases. *See, e.g.*, 2/7PM Tr. 71:1-75:13. Mr. Wei's testimony is further corroborated by the code bases themselves, which have been admitted into evidence, *see, e.g.*, JDX 290 & 295, as well as by documented correspondence and other admitted evidence. *See, e.g.*, JDX 16, 57, 30, 237, 258. Further corroboration is provided by the testimony of non-interested third-party witnesses, Messrs. Berners-Lee, Bina, Silvey, and Jacob, each of whom has testified that he recalled personally observing public demonstrations of Viola. *See, e.g.*, 2/7PM Tr. 7:16-8:12, 9:19-10:3, 11:8-12:15, 13:24-16:4, 19:6-20:7, 20:20-21:13 (Silvey); 2/6PM Tr. 197:2-7 (Bina); 2/7PM Tr. 172:7-178:20 (Jacobs); 2/7AM Tr. 55:4-14 (Berners-Lee).

### 5.  There Is Sufficient Evidence For The Jury To Find The Asserted Claims Obvious In Light Of Viola

To the extent there are any differences between Viola and the asserted claims, those involve nothing more than the "predictable use of known elements," as shown by strong evidence in the record. This includes Dr. Phillips' opinion that, regardless of whether they may be considered a single reference for anticipation purposes, the different versions and code bases of Viola may be considered in combination for purposes of obviousness—and when they are, they also render the patents obvious. *See, e.g.*, 2/8AM Tr. 38:3-40:3, 61:17-62:18, 78:1-24. The testimony of other credible witnesses in this case also provides ample evidence that the patents are obvious in light of Viola. *See, e.g.*, 2/7PM Tr. 17:15-22:3, 32:10-34:18, 35:4-13 (Silvey); JDX 56 (depiction of Plot.v in Viola). Indeed, Plaintiffs' own invalidity expert Dr. Martin did not dispute that the Viola code bases could be combined for obviousness. 2/8PM Tr. 88:9-12.

Plaintiffs simply reiterate their same arguments regarding four allegedly missing elements for obviousness as they did for anticipation.  But as noted above, Plaintiffs do not contest there is testimony that those elements would be obvious when combined with other references.  And contrary to Plaintiffs' allegations of "vagueness," Dr. Phillips specifically explains how each limitation is satisfied by Viola itself or Viola in combination with other prior art, such as the combination of Vplot with any version of Viola to satisfy the "distributed application" limitation.  *See, e.g.*, 2/8AM Tr. at 58:9-59:9.

Plaintiffs' argument that Viola "teaches away" from Vplot was not raised by their expert at trial.  Vplot was not abandoned, and various fact witnesses testified that it was obvious to combine Viola with Vplot and indeed did combine them.  *See* Part I.F.4.b *supra*.

## II.    PLAINTIFFS' RULE 59 REQUEST FOR NEW TRIAL SHOULD BE DENIED

Under Federal Rule of Civil Procedure 59, the court has the discretion to grant a new trial "based on its appraisal of the fairness of the trial and the reliability of the jury's verdict."  *See, e.g.*, *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 612-13 (5th Cir. 1985).  "But the burden a movant must meet is high.   'A motion for a new trial should not be granted unless the verdict is against the great weight of the evidence, not merely against the preponderance of the evidence.'"  *Ameranth, Inc. v. Menusoft Sys. Corp.*, No. 2:07-CV-271-RSP, 2011 U.S. Dist. LEXIS 56501, at *5-6 (E.D. Tex. May 26, 2011) (quoting *Dresser-Rand Co. v. Virtual Automation, Inc.*, 361 F.3d 831, 838 (5th Cir. 2004)).   "New trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great weight of the evidence."  *Dawson v. Wal-Mart Stores, Inc.*, 978 F.2d 205, 208 (5th Cir. 1992).

A new trial may not be granted on grounds of prejudicial legal error unless the movant demonstrates that it creates "substantial and ineradicable doubt whether the jury has been properly guided in its deliberations" and, even if erroneous, that it could have "affected the

outcome of the case." *z4 Techs., Inc. v. Microsoft Corp.*, 507 F.3d 1340, 1353 (Fed. Cir. 2007). "'[T]he burden of showing harmful error rests on the party seeking the new trial.'" *Sibley v. Lemaire*, 184 F.3d 481, 487 (5th Cir. 1999) (citation omitted). A request for a new trial under Rule 59 should be denied if any basis of invalidity is supported. *See Cordance*, 658 F.3d at 1339; *Northpoint Tech., Ltd. v. MDS Am., Inc.*, 413 F.3d 1301, 1311 (Fed. Cir. 2005) ("Northpoint notes that the defendants argued anticipation based on five different prior art references. . . . A failure of proof with respect to any single item of evidence does not justify a grant of either JMOL or a new trial."). Plaintiffs propose three reasons for its request for new trial, but none is availing.

### A.      There Was No Jury Confusion, Passion, Or Prejudice

Plaintiffs complain that Defendants' fact witnesses offered testimony regarding "web-related technology" that they had dedicated to the public. Mot. at 25. Plaintiffs conclusorily assert this testimony "had little or nothing to offer" regarding invalidity and contend that it was offered to encourage "passion and prejudice." *Id.* But the testimony concerning what was available in the public domain and known to the public years prior to the application of the patents-in-suit was squarely relevant to the state of the art and what technology would have been obvious to a person of ordinary skill at the time. That is, it is at a minimum relevant to at least the first two "underlying factual questions" to obviousness: the scope and content of the prior art and the level of ordinary skill in the art. *See* Mot. at 16-17. Furthermore, Plaintiffs do not contest that the Court instructed the jury as to the proper standards for assessing invalidity, and Plaintiffs even requested and received a specific jury instruction to prevent jury confusion related to "dedication to the public." Dkt. No. 1337 at 4 ("You may not determine to invalidate a patent merely because you believe the invention should be dedicated to the public."). Notably, Defendants' counsel displayed and specifically referenced this same instruction and encouraged

the jury to follow it.    2/9 Tr. 107:6-12.    As such, Plaintiffs' claim of passion and prejudice falls flat.

Moreover, Plaintiffs questioned why the asserted prior art was not itself patented to suggest incorrectly to the jury that only patented work could constitute legitimate invalidating prior art.    *See, e.g.*, 2/8AM Tr. 82:5-7, 83:2-83:16.    The witnesses' testimony concerning their efforts to disseminate their work to the public—rather than patent it—was therefore necessary to explain why their work was not patented to rebut this improper implication.

Second, Plaintiffs reiterate that Dr. Phillips' expert testimony failed to explain "how any Viola-related evidence in the record matched up with the claim limitations."    As noted above, any one basis of invalidity is sufficient to support the verdict and deny a new trial.    Thus, Plaintiffs' motion for new trial should be denied without need for further consideration of Plaintiffs' (incorrect) "Viola-related" allegations because there was sufficient evidence for a jury to conclude the patents were invalid in light of MediaView, Mosaic, and HTML+.    Regardless, for the reasons detailed above, Dr. Phillips' testimony concerning Viola was more than sufficient as it covered each asserted claim element, and it was further supported by the ample evidence offered by the other witnesses as well as documentary evidence and source code.

Third, Plaintiffs reiterate their complaint that Defendants' counsel read from admitted source code and "offered new 'testimony'" in closing.    Mot. at 26-27.    As Plaintiffs' brief acknowledges, to the extent they had any concern about counsel's closing statements or the admitted code, Plaintiffs had the opportunity to but elected not to object at the time of trial.    Mot. at 28 n.14.    While collaterally attacking Defendants' closing statement as "improper," Plaintiffs' brief nonetheless appears to concede that it was harmless, admitting, "Plaintiffs, however, do not argue that a new trial is justified by that improper testimony."    *Id*.

Plaintiffs argue that a new trial is justified because counsel's statement was allegedly part

of "Defendants' overall trial strategy."   But for the same reasons discussed above, Defendants'

closing was proper and correctly identified examples of type information in the Viola code,

including "TYPE = Doodle" for the Doodle.v application example.   *See* 2/9 Tr. at 105:22-106:3

(quoted *supra*); DDEM 3 [Ex. 3] (excerpting JDX 290 at p. 45).   And again, such Viola-related

statements would not justify a new trial in light of the other unrebutted theories of invalidity

justifying the verdict.   Moreover, the jury was cautioned that the statements of counsel were not

evidence both before and after the statement was made.   2/6PM Tr. 14:11-13; 2/9 Tr. 17:2-4;

*see Learmonth v. Sears, Roebuck & Co.*, 631 F.3d 724, 732-33 (5th Cir. 2011) (district court's

instruction that counsel's argument did not constitute evidence minimized any prejudice).

Accordingly, Plaintiffs' alleged "errors" were harmless and provide no basis for a new trial.

*See Liner v. J.B. Talley & Co., Inc.*, 618 F.2d 327, 329-30 (5th Cir. 1980) (noting "extreme

reluctance" to grant relief on closing arguments in the absence of an objection made at trial and

finding no error where court gave instructions that counsel's statements were not evidence).

Finally, Plaintiffs point to a jury note sent during deliberations seeking "a computer to

view a CD" as indicative of the jury's confusion.   Mot. at 27.   But Plaintiffs' conclusory

assertion aside, this note hardly suffices to carry Plaintiffs' heavy burden to overcome the jury's

invalidity verdict post-trial.[15]   This post-verdict complaint is another example of a wait-and-see

approach that cannot be countenanced.   If Plaintiffs thought the jury needed to be instructed in

some way after the jury's note, it was incumbent on Plaintiffs' counsel to seek an instruction,

object to the return of the verdict, or otherwise register their complaint.   They had plenty of

opportunity to do so.   Allowing litigants to wait to see the verdict before registering an

objection would encourage cynical gamesmanship that has no place in this Court.   Plaintiffs

---

[15] Plaintiffs' complaint that Defendants never showed the jury the code is untrue.   While there is no requirement that the jury view the underlying source code, regardless, not only Dr. Phillips but also Mr. Wei and other fact witnesses presented and explained the relevant code, such as the VOBJF tag, to the jury.   *See, e.g.*, 2/8AM at 46:25-50:4, 127:16-25 (Phillips, explaining code).

cannot be heard to claim jury confusion now.

### B.        The Jury's Verdict Is Supported By the Great Weight Of The Evidence

Plaintiffs simply reiterate the same contentions regarding the alleged "failures of proof that justify JMOL."   Mot. at 28.   Accordingly, for the same reasons detailed above, Plaintiffs failed to carry their heavy burden and certainly fail to explain, beyond their conclusory assertion, what the "great weight of the evidence thus confirms."   *Id.* at 29.   For example, there is not only sufficient but great weight of evidence—uncontested by Plaintiffs—to support the jury's verdict of invalidity based on obviousness in light of MediaView.

### C.        The Plaintiffs' Litigation Settlements Were Properly Excluded

Plaintiffs reiterate their suggestion that the Court committed "legal error" in excluding settlements.   Mot. at 30.   For the reasons stated above, these settlements were properly excluded, and as discussed above the jury did weigh and reject evidence of commercial success and licensing in its determination that the patents were nonetheless invalid.

### CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs' Renewed Motion for Judgment as a Matter of Law Under Rule 50(b) Or For New Trial Under Rule 59.

Dated:   March 29, 2012

*/s/ Jennifer H. Doan*
Edward Reines (Bar No.135960)
edward.reines@weil.com
Jared Bobrow (Bar No. 133712)
jared.bobrow@weil.com
Sonal N. Mehta (Bar No. 222086)
sonal.mehta@weil.com
Andrew L. Perito (Bar No. 269995)
andrew.perito@weil.com
Aaron Y. Huang (Bar No. 261903)
aaron.huang@weil.com
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Telephone: (650) 802-3000
Facsimile: (650) 802-3100

Doug W. McClellan (Bar No. 24027488)
doug.mcclellan@weil.com
WEIL, GOTSHAL & MANGES LLP
700 Louisiana, Suite 1600
Houston, TX 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511

Jennifer H. Doan (Bar No. 088090050)
jdoan@haltomdoan.com
Joshua R. Thane (Bar No. 24060713)
jthane@haltomdoan.com
Shawn A. Latchford (Bar No. 24066603)
slatchford@haltomdoan.com
HALTOM & DOAN
6500 Summerhill Road, Suite 100
Texarkana, TX 75503
Telephone: (903) 255-1000
Facsimile: (903) 255-0800

Otis Carroll (Bar No. 3895700)
Deborah Race (Bar No. 11648700)
IRELAND, CARROLL & KELLEY, P.C.
6101 South Broadway, Suite 500
Tyler, Texas 75703
Telephone: (903) 561-1600
Facsimile: (903) 581-1071
Email: fedserv@icklaw.com

Attorneys for Defendants
AMAZON.COM, INC. AND YAHOO! INC.

*/s/ Douglas E. Lumish* (with permission)

Douglas E. Lumish   (Bar No. 183863)
dlumish@kasowitz.com
Jeffrey G. Homrig (Bar No. 215890)
jhomrig@kasowitz.com
Joseph H. Lee (Bar No. 248046)
jlee@kasowitz.com
Parker C. Ankrum (Bar No. 261608)
pankrum@kasowitz.com
KASOWITZ, BENSON, TORRES &
FRIEDMAN LLP
333 Twin Dolphin Drive
Suite 200
Redwood Shores, CA 94065
Telephone: 650-453-5170
Facsimile: 650-453-5171

Jonathan Keith Waldrop
jwaldrop@kasowitz.com
KASOWITZ BENSON TORRES &
FRIEDMAN LLP
1360 Peachtree Street NE, Suite 1150
Atlanta, GA 30309
Telephone: (404) 260-6133
Facsimile: (404) 393-0743

Michael E. Jones (Bar No**.** 10929400)
mikejones@potterminton.com
Allen F.Gardner (Bar No. 24043679)
allengardner@potterminton.com
POTTER MINTON P.C.
110 N College , Suite 500
PO Box 359
Tyler, TX 75710-0359
Telephone: (903) 597-8311
Facsimile: (903) 593.0846

Brandon Stroy (*pro hac vice*)
brandon.stroy@ropesgray.com
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY 10036
Telephone: (212) 596-9000
Facsimile: (212) 596-9090

James R Batchelder (*pro hac vice*)
James.Batchelder@ropesgray.com
Han Xu (*pro hac vice*)
han.xu@ropesgray.com
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199
Telephone: (617) 235-4903
Facsimile: (617) 235-9873

Mark D. Rowland (Bar No. 157862)
mark.rowland@ropesgray.com
Rebecca R. Hermes (Bar No. 252837)
rebecca.hermes@ropesgray.com
Sasha Rao (Bar No. 244303)
sasha.rao@ropesgray.com
Lauren N. Robinson (Bar No. 255028)
lauren.robinson@ropesgray.com
ROPES & GRAY LLP
1900 University Ave., 6th Floor
East Palo Alto, CA 94303
Telephone: (650) 617-4000
Facsimile: (650) 617-4090

Attorneys for Defendants
GOOGLE INC. and YouTube LLC


*/s/ Christopher M. Joe*  (with permission)
Christopher M. Joe (Bar No. 00787770)
chris.joe@bjciplaw.com
Eric W. Buether (Bar No. 03316880)
eric.buether@bjciplaw.com
Brian A. Carpenter (Bar No. 03840600)
brian.carpenter@bjciplaw.com
Mark D. Perantie (Bar No. 24053647)
mark.perantie@bjciplaw.com
Niknaz F. Bukovcan
niky.bukovcan@bjciplaw.com
BUETHER JOE & CARPENTER, LLC
1700 Pacific Avenue, Suite 2390
Dallas, TX 75201
Telephone: (214) 466-1279
Facsimile (214) 635-1830

Attorneys for Defendant
J.C. PENNEY CORPORATION, INC.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a).  As such, this document was served on all counsel who have consented to electronic services on this the 29th day of March 2012.  Local Rule CV-5(a)(3)(A).

*/s/ Jennifer H. Doan*
Jennifer H. Doan